CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, a Delaware Corporation, Plaintiff,

v.

Raymond KASSEL, Raymond Kassel, Individually and in his capacity as Director of Transportation, Robert Rigler, Individually, and in his capacity as a member and Chairman of the Transportation Commission, L. Stanley Schoelerman, Individually, and in his capacity as a member of the Transportation Commission, Donald Gardner, Individually, and in his capacity as a member of the Transportation Commission, Jules Busker, Individually, and in his capacity as a member of the Transportation Commission, Allan Thoms, Individually, and in his capacity as a member of the Transportation Commission, Barbara Dunn, Individually, and in her capacity as a member of the Transportation Commission, William McGrath, Individually, and in his capacity as a member of the Transportation Commission, Jon McCoy, Individually, and in his capacity as Director of the Motor Vehicle Division, Charles W. Larson, Individually, and in his capacity as Commissioner of the Department of Public Safety, Edward Dickinson, Individually, and in his capacity as Chief of the Iowa Highway Patrol, Richard C. Turner, Individually, and in his capacity as Attorney General, and Robert D. Ray, Individually, and in his capacity as Governor, Defendants.

Motor Club of Iowa, Defendant Intervenor.

Civ. No. 78–179–1.

United States District Court,
S. D. Iowa, C. D.

Aug. 16, 1979.

**546**

Anthony R. Varda, John Varda, John H. Lederer, Jon P. Axelrod, DeWitt, McAndrews & Porter, S. C., Madison, Wis., Kent M. Forney, Cecil L. Goettsch, John C. Cortesio, Jr., Terry C. Hancock, Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, Iowa, for plaintiff.

Robert W. Goodwin, Sp. Asst. Atty., Lester A. Paff and Dennis D. Hogan, Asst. Attys. Gen., and General Counsel to Dept. of Tr., Ames, Iowa, for defendants.

R. Richard Bittner, Robert D. Lambert, Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, Iowa, for defendant intervenor.

## MEMORANDUM OPINION AND ORDER.

STUART, Chief Judge.

This is an action for declaratory and injunctive relief brought by Consolidated Freightways Corporation of Delaware (CF). It seeks to have Section 321.457(6) of the Iowa Code, which limits a combination of three vehicles coupled together to 60 feet, declared to be an unconstitutional burden on interstate commerce. It also alleges that certain exceptions to that limitation found in the statutes, departmental regulations, and permit and enforcement practices unconstitutionally discriminate against interstate commerce. The defendants are various responsible state officials. The Motor Club of Iowa, an affiliate of the American Automobile Association, was given permission to intervene on behalf of the defendants.

The relief requested is directed toward and limited to "Interstate Highways 80, 35, 280, 380, 29, 680 or 235, access routes to and from plaintiffs terminals, and reasonable access from said Interstate Highways to facilities for food, fuel, repairs or rest".

The limitation of the issues to the Iowa Interstate System and reasonable access thereto has an important bearing on the Court's decision.

The trial lasted 14 days. The oral testimony was supplemented by a large number of depositions and hundreds of exhibits. It would unduly extend this opinion to review the evidence. The Court will state the findings of fact in narrative form as ultimate facts.

### General Background

CF is one of the country's largest general commodity carriers. General commodity carriers usually transport small individual shipments between two points on its route structure. They deliver freight to destinations beyond their authority by interlining or interchanging with other general commodity carriers. They are obligated to provide timely, complete service under published rates to the public without discrimination. The basic pattern for the movement of LTL (less than a load) shipments is as follows: (1) pick up from the shipper; (2) consolidate with other shipments moving in the same direction at the originating terminal; (3) dispatch of the consolidated trailer load to a "break bulk" or reconsolidation terminal; (4) unload at the break bulk terminal and reconsolidate shipments from different points of origin moving to the same destination terminal; (5) dispatch the reconsolidated trailer load over-the-road to the destination area terminal; (6) unload the over-the-road trailer and reconsolidate shipments for logical local delivery service; and (7) deliver to the consignee. "Cross-dock" or break bulk handling creates delays, adds costs and exposes the freight to loss or damage. For efficient and economical operation it should be kept to a minimum.

CF operates in 46 states and has a complex system of routes, terminals and mainline driver relay stations. Computers are utilized to improve its efficiency and service. It has an intensive safety program including driver's qualification tests, safety meetings, periodic equipment inspections,

driver's reports, patrolling safety supervisors, and accident investigations.

CF's standard combination of units for transcontinental movement of freight is a sixty-five foot twin which consists of a tractor, two 27 or 28 foot trailers and a dolly to connect the trailers. It also uses fifty-five foot semi-trailers, particularly in the areas of the country where twin trailers are prohibited. For Iowa use, it couples a 22 foot trailer with a 27 or 28 foot trailer. Although twins can carry more freight, CF is able to reduce the cross-dock handling by using two smaller trailers rather than one large one. Hereinafter reference to "twins" or "double bottoms" will mean a 65 foot combination of units. When the reference is to a double bottom of a different length, the length will be stated. "Semi" will be used to refer to a 55 foot combination of a tractor and one trailer.[1]

We are concerned here with CF's route that originates in the industrial east and distributes the products manufactured there at various locations west of Iowa and CF's route that originates in the Twin City area in Minnesota and distributes the freight south or west of Iowa. Of course, we are also concerned with the return trips.

Interstate 80 (I–80) which crosses Iowa, is a principal east/west transcontinental route. Twins are lawful its entire length except for Iowa, Pennsylvania and New Jersey. Interstate 35 (I–35) is a principal north/south route. Twins are lawful in all states it passes through except Iowa. CF generally uses twins on these routes, consequently, it must divert its trucks off of these interstates around Iowa. This diversion, caused by Iowa's restriction, generated this lawsuit.

### Impact on Interstate Commerce

The diversion of twins around Iowa results in longer trips for those carriers that use twins. CF also diverts many of its semis around Iowa. This operational decision was made so that its driver relay system could function more efficiently. These added miles add to the cost of operation,[2] cause greater fuel consumption, increase the number of miles of highway that are subjected to wear and result in more accidents, injuries and fatalities. In the Court's opinion these undisputed facts create a substantial impact on interstate commerce. *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 445, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978).

The question is whether this impact, under the facts and circumstances shown by the evidence in the case, creates an unconstitutional burden on interstate commerce.

### Burden on Interstate Commerce

The Commerce Clause of the United States Constitution prevents states from erecting barriers to the free flow of interstate commerce. However, state legislation designed to serve legitimate state interests that is applied without discriminating against interstate commerce, does not violate the Commerce Clause even though it affects interstate commerce. When legiti-

1. Diagrams showing the configuration of the typical semi and twin are found in the appendix to *Raymond Motor Transport, Inc. v. Rice,* 417 F.Supp. 1352, 1363 (D.Wis.1976).

2. The Iowa DOT estimated the increased cost of Iowa's limitation statute to be at least $12,-644,000 annually based on 1974 carrier operating costs. CF offered evidence that the ban caused its vehicles to travel over 3,000,000 additional miles annually at an added cost of $2,000,000.

 Professor Pogue, an economist, testified for defendants. He determined that CF's costs associated with the Iowa bypass amounted to only ⅓ of one percent of its total operating costs. He concluded therefrom that the $2,000,000 estimate would have a minimal effect upon freight rates and consequently a minimal effect upon interstate commerce. In the Court's opinion, the extent of the burden on interstate commerce should not be determined by this type of calculation. The percentage figure is small because CF's operation is nationwide. The percentage would be much larger if the computation was based on the operation of a small regional carrier. The Court believes the factors mentioned in the opinion are proper considerations in determining the impact on interstate commerce. This is a case where cost is relevant to the issue of burden on commerce. *Raymond,* 434 U.S. at 445 fn. 21, 98 S.Ct. 787.

mate local concerns overlap national interests represented by the Commerce Clause, and Congress has not acted, the Court must consider the weight and nature of the state regulatory concern in the light of the extent of the burden imposed on interstate commerce. *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440–441, 98 S.Ct. 787, 54 L.Ed.2d 664 (and citations) (1978); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 528–29, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959).

When the legitimate local concern is highway safety, the Courts have given great deference to state regulations. *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 783, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945); *Maurer v. Hamilton*, 309 U.S. 598, 604, 60 S.Ct. 726, 84 L.Ed. 969 (1940); *South Carolina Highway Dept. v. Barnwell Bros.*, 303 U.S. 177, 190–92, 58 S.Ct. 510, 82 L.Ed. 734 (1938); *Sproles v. Binford*, 286 U.S. 374, 390, 52 S.Ct. 581, 76 L.Ed. 1167 (1932); *Morris v. Duby*, 274 U.S. 135, 143–44, 47 S.Ct. 548, 71 L.Ed. 966 (1927).

"These safety measures carry a strong presumption of validity when challenged in court. If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective. Policy decisions are for the state legislature, absent federal entry into the field. Unless we can conclude on the whole record that 'the total effect of the law as a safety measure in reducing accidents and casualties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it' * * * we must uphold the statute." *Bibb v. Navajo Freight Lines*, 359 U.S. 520, 524, 79 S.Ct. 962, 965, 3 L.Ed.2d 1003 (1959). Quoted in *Raymond*, 434 U.S. at 443, 98 S.Ct. at 795.

In his concurring opinion in *Raymond*, Justice Blackmun states:

In other words, if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce. 434 U.S. at 449, 98 S.Ct. at 798.

In *Raymond*, the Supreme Court held that a Wisconsin ban on 65 foot twins similar to the Iowa statute placed an unconstitutional burden on interstate commerce. As this case reaches the court in a far different posture than *Raymond*, all parties cite it and seek support for their various positions from it. There, the state "virtually defaulted in its defense of the regulations as a safety measure." 434 U.S. at 444, 98 S.Ct. at 796. Here, the defendants made an all out effort to reinforce the "strong presumption of the validity" of the statutory limitation as a safety measure by extensive cross-examination and full presentation of evidence. The basis for the Supreme Court's decision was the uncontroverted evidence that 65 foot twins are as safe as, if not safer than 55 foot semis. The Court stated:

the challenged regulations violate the Commerce Clause because they place a substantial burden on interstate commerce and they cannot be said to make more than the most speculative contribution to highway safety.

*Raymond*, 434 U.S. at 447, 98 S.Ct. at 797.

■ After a thorough review of the evidence bearing upon the relative safety of 65 foot twins, 60 foot twins and 55 foot semis, the Court can only conclude, in spite of defendants' efforts, that there is no valid safety reason for barring twins from Iowa's highways because of their configuration.

The evidence convincingly, if not overwhelmingly, establishes that the 65 foot twin is as safe as, if not safer than, the 60 foot twin and the 55 foot semi. Many of the studies relied on to support this position were not designed to answer this specific question and did not eliminate possible biases. Therefore, they were not statistically acceptable. However, they were of some value as evidence. Some of the biases favored semis. Some favored twins. Nevertheless, these studies, including one by Iowa's DOT in 1975, indicated that overall, the twin is as safe as a semi or a 60 foot

twin. State highway officials from the surrounding states unanimously agreed that twins were as safe as the trucks now legal in Iowa. CF's experts on highway safety were of the same opinion. None of defendants' experts stated that twins were not as safe as semis overall.[3] Although some drivers preferred the handling characteristics of semis over twins, none felt that twins were unsafe. CF's own statistics and its "matched pair analysis" are strong support for the finding that there is little, if any, difference in the safety of semis, 60 foot twins or 65 foot twins.

Twins and semis have different characteristics. Twins are more maneuverable, are less sensitive to wind, and create less splash and spray. However, they are more likely than semis to jackknife or upset. They can be backed only for a short distance. The negative characteristics are not such that they render the twin less safe than semis overall. Semis are more stable but are more likely to "rear end" another vehicle.

The added length of the twin is not a substantial factor on four lane divided highways. The state by legalizing the 65 foot automobile carrier has weakened its claim that the extra length creates a safety hazard. It has practically destroyed its argument that double trailers are an additional safety hazard by legalizing the 60 foot twin. The uncontradicted evidence established that the extra five feet in length makes the 65 foot twin more stable than the 60 foot twin.

Defendants claim that the evidence is inconclusive on the relative safety issue, and it is a reasonable policy decision for Iowa to make a safety distinction between twins and semis. Defendants argue that they should prevail because of the strong presumption. The Court cannot accept this argument as it believes that the evidence clearly establishes that the twin is as safe as the semi.

If the extent of the burden placed on interstate commerce were to be weighed against the additional safety hazards created by the configuration of the twins alone, the Court would hold, without further discussion, that the legislation excluding twins has so slight or problematical effect in reducing accidents or casualties that its value as a safety measure does not outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it. It may be, under *Raymond*, that the inquiry should end at this point.

However, as one reads *Raymond*, one senses the reluctance of the Supreme Court to decide the case as it felt it must under the inadequate defense raised by the State of Wisconsin. Justice Powell uses terms like "default", "overwhelmingly one sided evidence", and "uncontroverted evidence". In his concurring opinion, Justice Blackmun characterizes the Court's decision as a "conclusion that the safety interests have not been shown to exist as a matter of law". 434 U.S. at 450, 98·S.Ct. at 798. Previous pertinent cases are cited, quoted and explained without any indication that the Court intends to make a substantial departure from previous holdings. The Court restates its reluctance to invalidate state highway safety regulations under the Commerce Clause as the propriety of local regulation in this area has been long recognized. 434 U.S. at 443, 98 S.Ct. 787. Justice Powell concludes his opinion by saying:

> Our holding is a narrow one, for we do not decide whether laws of other States restricting the operation of trucks over 55 feet long, or of double-trailer trucks, would be upheld if the evidence produced on the safety issue were not so overwhelmingly one-sided as in this case. 434 U.S. at 447, 98 S.Ct. at 797.

Although the Court has concluded that the evidence clearly establishes that the twins are as safe as, if not safer than semis, it believes that the tenor of the opinion is

---

**3.** See Fn. 3 attached to this opinion as an appendix for a discussion of defendant's expert testimony.

such that the other reasons advanced by the defendants in support of the limitation must be closely examined.

If the length limit for twins was raised from 60 feet to 65 feet, there would be a substantial increase in the number of trucks using Iowa's interstate system. The 1975 report of the Iowa DOT entitled Sixty-five Foot Twin Trailers in Iowa—Perspective, predicted that at that time an additional 206 trucks would use the highways each day for a total of 75,000 additional truck trips annually. Current estimates are about 10 per cent higher. The increased truck traffic would mean an increase in the number of accidents and fatalities in Iowa. The traffic mix between trucks and cars would be less favorable and the trend toward smaller cars would increase the possibility of more serious accidents. Automobile insurance rates would tend to increase and the need for additional highway patrolmen would be intensified. Iowa's citizens would be adversely affected by the increased wear on the interstate highways and the consumption of additional quantities of its limited supply of fuel.

On the positive side, the taxes and fees paid by the twins would more than offset the cost of the additional damage to the highways, if the proceeds were all applied to the interstate system. Iowans would derive substantial economic benefits from the additional traffic.

Both Governor Ray and Robert Rigler, Chairman of the DOT Commission, emphasized the importance of protecting the interests and welfare of Iowa's citizens from the negative consequences of the increased traffic. As the legislature has not changed the law, it is apparent that Iowa's policy makers have decided that the disadvantages of increasing the length limitation outweigh the benefits that would result. These are legitimate local concerns which are entitled to consideration in making the "delicate adjustment of the conflicting state and federal claims". *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 553, 69 S.Ct. 657, 679, 93 L.Ed. 865 (1948).

On the other hand it is equally clear that Iowa's length restriction causes the trucks affected by the ban to travel more miles over more dangerous roads in other states which means a greater overall exposure to accidents and fatalities. More miles of highway are subjected to wear. More fuel is consumed and greater transportation costs are incurred.

We therefore have before us a situation in which matters of legitimate local concern not only overlap with the national interests expressed by the Commerce Clause, but safety and economic interests of other states in particular and the nation as a whole. The resolution of this conflict "necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce". *Raymond*, supra, 434 U.S. at 441, 98 S.Ct. at 794.

A prime consideration in the "delicate adjustment" process must be the fact that we are dealing with the interstate system. In Iowa, it is composed of four or more lane divided highways with limited access. Roads connected to the interstate are incidently affected. Iowa's interstates are part of a national network of highways designed to provide fast and efficient transportation across the country. Ninety percent of the costs was financed by federal funds. Some funding is now being provided by the federal government for major resurfacing and reconstruction projects. Federal standards must be met. The system is intended to serve the needs of interstate traffic. The cases, which stressed the "peculiarly local concerns" in the use of the state's highways, *Morris v. Duby*, supra (1927); *Sproles v. Binford*, supra (1932); *South Carolina Highway Department v. Barnwell Bros.*, supra (1938); and *Maurer v. Hamilton*, supra (1940), all antedated the establishment of the interstate system. Their holdings were summarized in the following language in *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 783, 65 S.Ct. 1515, 1527, 89 L.Ed. 1915 (1945):

[In *Barnwell*] and in *Maurer v. Hamilton*, supra, we were at pains to point out that there are few subjects of state regulation affecting interstate commerce which are so peculiarly of local concern as is the use of the state's highways. Unlike the railroads, local highways are built, owned and maintained by the state or its municipal subdivisions. The state is responsible for their safe and economical administration. Regulations affecting the safety of their use must be applied alike to intrastate and interstate traffic. The fact that they affect alike shippers in interstate and intrastate commerce in great numbers, within as well as without the state, is a safeguard against regulatory abuses. Their regulation is akin to quarantine measures, game laws, and like local regulations of rivers, harbors, piers, and docks, with respect to which the state has exceptional scope for the exercise of its regulatory power, and which Congress not acting, have been sustained even though they materially interfere with interstate commerce (303 U.S. at 187–188, 58 S.Ct. 510 and cases cited).

*Raymond* continues the great deference to state regulations to promote highway safety within the state, 434 U.S. at 443, 98 S.Ct. 787, but it recognizes the emergence of the interstate system, 434 U.S. at 444, fn. 19, 98 S.Ct. 787.

 Because of the important part the federal government plays in the design, construction, maintenance and regulation of interstates, many of the reasons given by the Court for allowing states wide discretion in regulating highways do not apply to interstates. If it had not been shown that twins are as safe as semis, *Raymond* would support a finding that the limitation did not unconstitutionally burden interstate commerce. The strong presumption of its validity as a safety measure, to keep less safe vehicles off of Iowa's highways, would have prevailed. But, if the safety consideration is the reduction of accidents and casualties in Iowa by diverting traffic around Iowa with an overall increase in accidents elsewhere, the fact that interstate highways are involved becomes an important factor in the decision. There is a parochialism about such a local approach to public health and safety that gives it less weight in the balance between legitimate local concerns for the health and economic welfare of its citizens and the burden on interstate commerce. It has the aura of protectionism usually associated with discrimination against interstate commerce.

There are situations in which regulations intended to limit the amount of traffic on a particular highway would be a legitimate safety measure. *Bradley v. Public Utilities Commission*, 289 U.S. 92, 96, 53 S.Ct. 577, 77 L.Ed. 1053 (1933). But, here, the evidence shows that no such congestion exists on Iowa's interstate roads. The "level of service" offered the public is quite high. Only in localized urban situations during the rush hour does congestion become a problem. The percentage of trucks on the interstate during these periods is quite small.

In the Court's opinion the balance here must be struck in favor of the federal interests. The *total effect* of the law as a safety measure in reducing accidents and casualties is so slight and problematical that it does not outweigh the national interest in keeping interstate commerce free from interferences that seriously impede it. Legitimate local concerns are outweighed by the burden the limitation places on interstate commerce.

The Court is not particularly comfortable with this result. The long established reluctance of the courts to interfere with State policy on the weight, width and length of vehicles permitted on its highways is being eroded. The public policy of the State of Iowa has been that it is for the best interest of its citizens to limit the length of twins to 60 feet. The public policy of the surrounding states for reasons known to them raised the limit to 65 feet. Apparently they made a policy decision that the advantages of permitting twins outweighed the disadvantages. Here, the Interstate Commerce Clause is being used to force Iowa to abandon its chosen public policy. The trucking industry has long

played leap frog with weight and length limitations to achieve alternate increases. Truckers that haul products that "cube out" before they "weigh out" ask for an increase in length of a few feet so they can take advantage of the weight limit. Then those truckers that haul products that "weigh out" before they "cube out" ask for weight increases so they can utilize the additional length. It is not difficult to establish that the small increase in weight or length creates no additional safety hazard or damage to highways. With some officials saying 108 foot triple-bottoms impose no additional safety hazard on interstates, there appears to be no end in sight.

■ If this concern points to anything of particular significance, it is that the interstates should be treated differently than other highways. Regulations regarding the length, width and weight of vehicles using the interstate system should be uniform. Congress should pre-empt this area of the law and set these standards. Creeping increases in weight and length limitations would then be subject to national scrutiny and the national will. State by state action would be eliminated. But, even if Congress fails to act, the courts should consider the involvement of interstate highways an important factor in weighing local concerns against the extent of the burden on interstate commerce.

### Discrimination against Interstate Commerce

■ Section 321.457(6) of the Iowa Code which limits the length of a combination of three vehicles to 60 feet is neutral on its face. However, CF claims that certain statutory exceptions and exemptions, provisions for trip or annual permits and enforcement policies do, in effect, discriminate against interstate commerce. As the Court has concluded that section 321.457(6) places an unconstitutional burden on interstate commerce, it is not necessary to make a detailed analysis of CF's claims in this regard. However, limited comments may be helpful to the reviewing court.

■ Whether state legislation is designed to protect the health, safety and welfare of its citizens or is intended to forge an economic preference for its own commercial interests, the legislative purpose cannot be accomplished by discriminating against interstate commerce. A state cannot isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade. *Philadelphia v. New Jersey*, 437 U.S. 617, 626–28, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). The crucial inquiry is whether the questioned statute, regulation, or permit procedure is basically a protectionist measure or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental. *Philadelphia v. New Jersey*, supra, 437 U.S. at 624, 98 S.Ct. 2531.

Some questions might well be raised as to the standing of CF to make claims of discrimination because there is little, if any, relationship between the nature of its operation and the nature of the exceptions and exemptions complained of. However, as the Court concludes that there is no unconstitutional discrimination against interstate commerce, standing will be assumed.

Section 321.457(7) Code of Iowa empowers a border city to enact a municipal ordinance authorizing vehicles which meet the width and length limitations of the abutting state to operate within its city limits. CF could take advantage of any ordinance passed under this section. CF did not establish that the state permits twins to operate in border cities that have not passed such ordinance. This exception does not permit these vehicles to operate on highways of the state outside of the border cities. It is consistent with the state policy of protecting its highways and citizens from additional twin traffic across the state.

Section 321.457(3) authorizes the transportation of livestock in 60 foot semi-trailers. No distinction is made between intrastate and interstate commerce. It is a rational legislative decision and does not discriminate against 65 foot twins.

Section 321.457(4) allows the movement of mobile homes up to 48 feet in length if the length of the combination does not exceed 60 feet. As this is an indivisible load, it would be impossible to move a mobile home in Iowa without such exception. "The uses of the highways for this sort of transportation are temporary only and essential to the public welfare." *Sproles v. Binford*, 286 U.S. 374, 386, 52 S.Ct. 581, 584, 76 L.Ed. 1167 (1932).

Section 321E.28 empowers the Iowa DOT and local authorities to issue single trip permits to move larger mobile homes and factory built structures when the point of origin, or destination, is in Iowa. Severe restrictions are placed on such movement. This section strengthens Iowa's commitment to highway safety while it makes a reasonable accommodation for the needs of its citizens and the flow of commerce.

Section 321.457(5) permits the use of a combination of vehicles 60 foot long to transport boats, automobiles, light trucks, farm and industrial tractors, implements of husbandry and travel trailers. Boats, cars and light trucks may overhang the front or rear of the vehicle three feet if the load does not exceed 65 feet in length. There is no discrimination against interstate commerce. The exception does weaken the presumption of safety as it relates to the length of combinations of vehicles.

Section 321E.10 authorizes the issuance of annual permits for the movement of truck trailers manufactured or assembled in Iowa in a combination of two or more vehicles that does not exceed 70 feet to other points of manufacture or assembly in Iowa or to a point outside the state. Such movement is subject to severe restrictions which include the requirements that they move over the most direct route on highways at least 24 feet wide with no freight or additional load at speeds not in excess of 45 miles per hour. The restrictions again reveal the legislature's strong concern for highway safety while making a reasonable accommodation to the practical needs of its citizens.

The Iowa Code authorizes the Governor of Iowa to proclaim a state of emergency "to protect the public peace, health and safety, and to preserve the lives and property of the people of the state". Sections 29C.1 and 29C.3(1). The Governor has exercised this authority to permit longer and heavier vehicles to temporarily use Iowa's highways when shortages of fuel and livestock feed occurred. These proclamations did not unconstitutionally discriminate against interstate commerce.

The Court is of the opinion that none of the pertinent regulations discriminate against interstate commerce. The Court is also of the opinion that CF did not establish unequal or improper enforcement of the law or regulations. Discriminating enforcement constituting a discrimination against interstate commerce was not proven.

### Conclusion

The law provides a strong presumption that Section 321.457(6) of the Iowa Code limiting the length of a combination of three vehicles completed together to 60 feet is a valid public highway safety measure. Plaintiff successfully rebutted that presumption by showing that 65 foot twins are as safe as 60 foot twins and 55 foot semis. There is some benefit to Iowa citizens from the other reasons advanced for the limitation and they are legitimate local concerns. However, the burden imposed on interstate commerce is clearly excessive when related to the putative benefits received in Iowa from the limitation. The limitation imposed by section 321.457(6) cannot stand when applied to the Iowa Interstate Highway System.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED by the Court that Section 321.457(6) Code of Iowa 1977 is unconstitutional as applied to 65 foot twin trailers insofar as it places greater restriction on their operation than on the operation of 60 foot twin trailers or 55 foot semi-trailers on Iowa Interstate Highways 80, 35, 280, 380, 29, 680 and 235 and roads furnishing reasonable access between said interstates and terminals and facilities for fuel, food, repairs, or rest. The Court would view any distance greater than five

miles as unreasonable. A shorter distance might be unreasonable if closer facilities are available.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED by the Court that the defendants and any other official of the State of Iowa under defendants' control, direction or authority are hereby enjoined from enforcing section 321.457(6) Code of Iowa 1977 against the operation of 65 foot twin trailers on Interstate Highways 80, 35, 280, 380, 29, 680 and 235 and roads furnishing reasonable access between said interstates and terminals and facilities for fuel, food, repairs, or rest to any greater degree than the 60 foot twin trailers and 55 foot semi-trailers are limited or burdened thereby.

## APPENDIX

3. The Court believes its conclusion requires that reference be made to the testimony of defendants' experts.

*Dr. Koehler,* a statistician, effectively pointed out the deficiencies in the various studies from a statistical standpoint. The studies were not specifically designed to test the comparative safety of twins and semis. They failed to eliminate or control important possible biases. He approved the methodology used by CF in compiling its "matched pair analysis", which compared the accident, injury and fatality records of twins and semis on an equal number of identical trips over the same route on a month-by-month basis for the year 1978. Each type of vehicle made 188,296 trips. Each type traveled over 56,000,000 miles. In the matched pair analysis, the semis were involved in 100 accidents resulting in 27 injuries and 1 fatality. The twins were involved in 106 accidents resulting in 17 injuries and 1 fatality.

Dr. Koehler was of the opinion that the sample was too small to make these results statistically significant because of the small number of accidents, injuries and fatalities. He felt the matched pair analysis indicated no "extremely gross" differences in accident rates, and provided slight to moderate evidence that the injury rate for twins was lower. He would have liked to have had the accident information for at least 3 years, but could think of no better way to eliminate the biases with the data available.

*Dr. Hall,* a mechanical engineer, had had no experience with highway construction or highway safety engineering. He obtained information from the comprehensive experiment and study by the American Association of State Highway Transportation Officials (AASHTO) conducted in about 1955 relating to highway wear and design to make calculations concerning the comparative damage to flexible (asphaltic) concrete highways caused by semis and twins. These computations are not acceptable because the figures used in the formula (SN numbers) were not applicable to the design of asphaltic concrete used on the interstates in Iowa. He also used "Bulley data" presented to a congressional committee relating to the "average road in the United States" to reach the conclusion that twins would cause more damage to the average road than semis. Such a computation is meaningless and has no relevance here. The percentages of Iowa interstates surfaced with portland cement and asphaltic concrete are known. A large portion is portland cement. Semis cause more damage to this type of pavement. Twins cause more damage to ordinary asphaltic concrete. There is a conflict in the evidence as to which formula should be used in calculating damage to "deep strength asphalt" also used on portions of Iowa's interstates. The mileage is not a significant factor here.

Dr. Peters is self-employed as a mechanical engineering consultant. He had read considerable scientific material relating to braking and based his analysis of stopping abilities of twins and semis on that literature. He found

that CF had good maintenance procedures. In his opinion twins brakes would be more apt to malfunction than semis because there were more parts in the system to fail. He expressed no opinion as to the overall safety of the twins compared to semis or 60 foot twins. He gave testimony concerning splash and spray from trucks passing over a wet surface and passing maneuvers for which no foundation was laid entitling him to express such opinions. He relied upon his driving experience and was in no better position to state such opinion than the average driver.

*Mr. Wandling*, a consulting engineer, testified that in his opinion a twin has "less yaw stability and greater amplification of lateral acceleration than a semi", but had no opinion as to how significant it might be under present conditions and the limited information available. Much of the foundation for that opinion was based upon a Michigan study of a double-bottom tanker. The study and a film disclosed that this vehicle had a dangerous propensity to upset under a not unusually severe maneuver to change lanes. The CF van twin is entirely different from the Michigan double-bottom tanker. A film of the identical test performed with the CF van discloses no such dangerous propensity. Mr. Wandling had no opportunity to see this film. The Court accepts Mr. Wandling's opinion that a twin has less yaw stability and greater amplification of lateral acceleration than a semi to some unidentified extent.

There is an indirect relationship between maneuverability and stability. The more maneuverable a vehicle is, the less stable it becomes. In the case of semis, some maneuverability has been sacrificed for greater stability. In the case of twins, some stability has been sacrificed for greater maneuverability. These choices do not mean that either vehicle is unsafe or that one is less safe overall than the other.

The Court is of the opinion that Dr. Hall, Dr. Peters and Mr. Wandling were not particularly well qualified to testify about the matters presented to them. Their real expertise lies in other areas.

*Dr. Carstens*, a civil engineer with a doctorate in transportation engineering, had engaged in studies relating to traffic conflicts which he defined as the possibility that two vehicles might desire to occupy the same road space at the same time requiring one or both to take some evasive action (turning, braking, speeding up, etc.) to avoid a collision. He was asked to look at the potential for increased accidents if vehicle length were increased from 60 to 65 foot. He made a field survey at one exit from I–35 and I–80 near Des Moines. Observers tabulated the length of time combination vehicles encroached on two lanes at right angles to the direction the trucks were traveling at the intersection. He computed the average rate of acceleration of the trucks for various maneuvers and calculated the additional time that the extra five feet would encroach upon the right-angle lanes. He prepared a chart showing the probability of the occurrence of a "suitable gap" occurring in traffic at various traffic volumes so that the 60 or 65 foot truck could make the maneuver without creating a traffic conflict.

The charts, tables and plats were all interesting but of little practical value. When the table reached the point that there would be no suitable gap for a 60 foot truck to enter a traffic stream of 2000 vehicles per hour until 333,000 vehicles had passed and one suitable gap for a 65 foot truck about every 500,000 vehicles, the calculations lost all significance. The practical fact is that it would take a 65 foot vehicle only a fraction of a second longer to make the maneuver than a 60 foot truck. It did not take these complex tables and cal-

culations to support the witnesses obvious conclusion that "an inescapable result of the increase in vehicle length is an expectation of an increase in accidents because of the type of maneuvers that they have to make in entering and crossing and diverging from traffic stream, and the fact that upon opposing traffic lanes is of necessity a direct function of the length of that vehicle." There was however no attempt to place this increased exposure to accidents in a practical context. The Court does not believe the extra five feet would create a significant additional safety hazard in performing the maneuvers described by the witness.