KASSEL, DIRECTOR OF TRANSPORTATION, ET AL. *v.*
CONSOLIDATED FREIGHTWAYS CORPORATION
OF DELAWARE

No. 79-1320.  Argued November 4, 1980—Decided March 24, 1981

664

Powell, J., announced the judgment of the Court and delivered an opinion, in which White, Blackmun, and Stevens, JJ., joined. Brennan, J., filed an opinion concurring in the judgment, in which Marshall, J., joined, *post*, p. 679. Rehnquist, J., filed a dissenting opinion, in which Burger, C. J., and Stewart, J., joined, *post*, p. 687.

*Mark E. Schantz,* Solicitor General of Iowa, argued the cause for appellants. With him on the briefs were *Thomas J. Miller,* Attorney General, *Robert W. Goodwin,* Special Assistant Attorney General, and *Lester A. Paff,* Assistant Attorney General.

*John H. Lederer* argued the cause for appellee. With him on the brief were *John Duncan Varda* and *Anthony R. Varda.**

Justice Powell announced the judgment of the Court and delivered an opinion, in which Justice White, Justice Blackmun, and Justice Stevens joined.

The question is whether an Iowa statute that prohibits the use of certain large trucks within the State unconstitutionally burdens interstate commerce.

I

Appellee Consolidated Freightways Corporation of Delaware (Consolidated) is one of the largest common carriers in

---

*Briefs of *amici curiae* urging reversal were filed by *Marshall Coleman,* Attorney General, *Walter A. McFarlane,* Deputy Attorney General, and *John M. McCarthy,* Assistant Attorney General, for the Commonwealth of Virginia; and by *Harry J. Breithhaupt, Jr.,* for the Association of American Railroads.

*Albert G. Fuller* filed a brief for the City of Auburn, Nebraska, as *amicus curiae* urging affirmance.

the country. It offers service in 48 States under a certificate of public convenience and necessity issued by the Interstate Commerce Commission. Among other routes, Consolidated carries commodities through Iowa on Interstate 80, the principal east-west route linking New York, Chicago, and the west coast, and on Interstate 35, a major north-south route.

Consolidated mainly uses two kinds of trucks. One consists of a three-axle tractor pulling a 40-foot two-axle trailer. This unit, commonly called a single, or "semi," is 55 feet in length overall. Such trucks have long been used on the Nation's highways. Consolidated also uses a two-axle tractor pulling a single-axle trailer which, in turn, pulls a single-axle dolly and a second single-axle trailer. This combination, known as a double, or twin, is 65 feet long overall.[1] Many trucking companies, including Consolidated, increasingly prefer to use doubles to ship certain kinds of commodities. Doubles have larger capacities, and the trailers can be detached and routed separately if necessary. Consolidated would like to use 65-foot doubles on many of its trips through Iowa.

The State of Iowa, however, by statute restricts the length of vehicles that may use its highways. Unlike all other States in the West and Midwest, App. 605, Iowa generally prohibits the use of 65-foot doubles within its borders. Instead, most truck combinations are restricted to 55 feet in length. Doubles,[2] mobile homes,[3] trucks carrying vehicles

---

[1] For an illustration of the differences between singles and doubles, see *Raymond Motor Transportation, Inc.* v. *Rice,* 417 F. Supp. 1352, 1363 (WD Wis. 1976) (three-judge court), rev'd, 434 U. S. 429 (1978).

[2] Iowa Code § 321.457 (6) (1979). The 60-foot double is not commonly used anywhere except in Iowa. It consists of a tractor pulling a large trailer, which in turn pulls a dolly attached to a small trailer. The odd-sized trailer used in the 60-foot double is not compatible for interchangeable use in other trailer combinations. See App. 23, 276–277, 353, 354.

[3] Iowa Code § 321.457 (4) (1979).

such as tractors and other farm equipment,[4] and singles hauling livestock,[5] are permitted to be as long as 60 feet. Notwithstanding these restrictions, Iowa's statute permits cities abutting the state line by local ordinance to adopt the length limitations of the adjoining State. Iowa Code § 321.457 (7) (1979). Where a city has exercised this option, otherwise oversized trucks are permitted within the city limits and in nearby commercial zones. *Ibid.*[6]

Iowa also provides for two other relevant exemptions. An Iowa truck manufacturer may obtain a permit to ship trucks that are as large as 70 feet. Iowa Code § 321E.10 (1979). Permits also are available to move oversized mobile homes, provided that the unit is to be moved from a point within Iowa or delivered for an Iowa resident. § 321E.28 (5).[7]

---

[4] § 321.457 (5).

[5] § 321.457 (3). After trial, and after the Court of Appeals' decision in this case, Iowa amended its law to permit all singles to be as large as 60 feet. 1980 Iowa Acts, ch. 1100.

[6] The Iowa Legislature in 1974 passed House Bill 671, which would have permitted 65-foot doubles. But Iowa Governor Ray vetoed the bill, noting that it "would benefit only a few Iowa-based companies while providing a great advantage for out-of-state trucking firms and competitors at the expense of our Iowa citizens." Governor's Veto Message of March 2, 1974, reprinted in App. 626. The "border-cities exemption" was passed by the General Assembly and signed by the Governor shortly thereafter.

The Iowa Transportation Commission, pursuant to authority conferred in Iowa Code § 307.10 (5) (1979), subsequently adopted regulations that would have legalized 65-foot doubles, provided that the legislature enacted a ban on studded snow tires. The Iowa Supreme Court declared these regulations void because their promulgation was impermissibly tied to legislative action. *Motor Club of Iowa* v. *Department of Transportation*, 251 N. W. 2d 510 (1977).

[7] The parochial restrictions in the mobile home provision were enacted after Governor Ray vetoed a bill that would have permitted the interstate shipment of all mobile homes through Iowa. Governor Ray commented, in his veto message:

"This bill . . . would make Iowa a bridge state as these oversized units are moved into Iowa after being manufactured in another state and sold

Because of Iowa's statutory scheme, Consolidated cannot use its 65-foot doubles to move commodities through the State. Instead, the company must do one of four things: (i) use 55-foot singles; (ii) use 60-foot doubles; (iii) detach the trailers of a 65-foot double and shuttle each through the State separately; or (iv) divert 65-foot doubles around Iowa.

Dissatisfied with these options, Consolidated filed this suit in the District Court averring that Iowa's statutory scheme unconstitutionally burdens interstate commerce.[8] Iowa defended the law as a reasonable safety measure enacted pursuant to its police power. The State asserted that 65-foot doubles are more dangerous than 55-foot singles and, in any event, that the law promotes safety and reduces road wear within the State by diverting much truck traffic to other States.[9]

In a 14-day trial, both sides adduced evidence on safety, and on the burden on interstate commerce imposed by Iowa's law. On the question of safety, the District Court found that the "evidence clearly establishes that the twin is as safe as the semi." 475 F. Supp. 544, 549 (SD Iowa 1979). For that reason,

"there is no valid safety reason for barring twins from Iowa's highways because of their configuration.

in a third. None of this activity would be of particular economic benefit to Iowa." Governor's Veto Message of March 16, 1972, reprinted in App. 641.

[8] Defendants, appellants in this Court, are Raymond Kassel, Director of the Iowa Department of Transportation, Iowa Governor Robert D. Ray, and state transportation officials Robert Rigler, L. Stanley Schoelerman, Donald Gardner, Jules Busker, Allan Thoms, Barbara Dunn, William McGrath, Jon McCoy, Charles W. Larson, Edward Dickinson, and Richard C. Turner.

[9] See 475 F. Supp. 544, 551 (SD Iowa 1979); 612 F. 2d 1064, 1068, 1069–1070 (CA8 1979). In this Court, Iowa places little or no emphasis on the constitutional validity of this second argument.

"The evidence convincingly, if not overwhelmingly, establishes that the 65 foot twin is as safe as, if not safer than, the 60 foot twin and the 55 foot semi. . . .

.          .          .          .          .

"Twins and semis have different characteristics. Twins are more maneuverable, are less sensitive to wind, and create less splash and spray. However, they are more likely than semis to jackknife or upset. They can be backed only for a short distance. The negative characteristics are not such that they render the twin less safe than semis overall. Semis are more stable but are more likely to 'rear end' another vehicle." *Id.*, at 548–549.

In light of these findings, the District Court applied the standard we enunciated in *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429 (1978), and concluded that the state law impermissibly burdened interstate commerce:

"[T]he balance here must be struck in favor of the federal interests. The *total effect* of the law as a safety measure in reducing accidents and casualties is so slight and problematical that it does not outweigh the national interest in keeping interstate commerce free from interferences that seriously impede it." 475 F. Supp., at 551 (emphasis in original).

The Court of Appeals for the Eighth Circuit affirmed. 612 F. 2d 1064 (1979). It accepted the District Court's finding that 65-foot doubles were as safe as 55-foot singles. *Id.,* at 1069. Thus, the only apparent safety benefit to Iowa was that resulting from forcing large trucks to detour around the State, thereby reducing overall truck traffic on Iowa's highways. The Court of Appeals noted that this was not a constitutionally permissible interest. *Id.,* at 1070. It also commented that the several statutory exemptions identified above, such as those applicable to border cities and the shipment of livestock, suggested that the law in effect benefited Iowa

residents at the expense of interstate traffic. *Id.*, at 1070–1071. The combination of these exemptions weakened the presumption of validity normally accorded a state safety regulation. For these reasons, the Court of Appeals agreed with the District Court that the Iowa statute unconstitutionally burdened interstate commerce.

Iowa appealed, and we noted probable jurisdiction. 446 U. S. 950 (1980). We now affirm.

## II

It is unnecessary to review in detail the evolution of the principles of Commerce Clause adjudication. The Clause is both a "prolific sourc[e] of national power and an equally prolific source of conflict with legislation of the state[s]." *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 534 (1949). The Clause permits Congress to legislate when it perceives that the national welfare is not furthered by the independent actions of the States. It is now well established, also, that the Clause itself is "a limitation upon state power even without congressional implementation." *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 350 (1977). The Clause requires that some aspects of trade generally must remain free from interference by the States. When a State ventures excessively into the regulation of these aspects of commerce, it "trespasses upon national interests," *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366, 373 (1976), and the courts will hold the state regulation invalid under the Clause alone.

The Commerce Clause does not, of course, invalidate all state restrictions on commerce. It has long been recognized that, "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761,

767 (1945). The extent of permissible state regulation is not always easy to measure. It may be said with confidence, however, that a State's power to regulate commerce is never greater than in matters traditionally of local concern. *Washington Apple Advertising Comm'n, supra,* at 350. For example, regulations that touch upon safety—especially highway safety—are those that "the Court has been most reluctant to invalidate." *Raymond, supra,* at 443; accord, *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 109 (1949); *South Carolina State Highway Dept.* v. *Barnwell Brothers, Inc.,* 303 U. S. 177, 187 (1938); *Sproles* v. *Binford,* 286 U. S. 374, 390 (1932); *Hendrick* v. *Maryland,* 235 U. S. 610, 622 (1915). Indeed, "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." *Raymond, supra,* at 449 (BLACKMUN, J., concurring). Those who would challenge such bona fide safety regulations must overcome a "strong presumption of validity." *Bibb* v. *Navajo Freight Lines, Inc.,* 359 U. S. 520, 524 (1959).

But the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause. In the Court's recent unanimous decision in *Raymond,*[10] we declined to "accept the State's contention that the inquiry under the Commerce Clause is ended without a weighing of the asserted safety purpose against the degree of interference with interstate commerce." 434 U. S., at 443. This "weighing" by a court requires—and indeed the constitutionality of the state regulation depends on—"a sensitive consideration of the weight

---

[10] JUSTICE STEVENS took no part in the consideration or decision of *Raymond.*

and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Id.*, at 441; accord, *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970); *Bibb, supra,* at 525–530; *Southern Pacific, supra,* at 770.

## III

Applying these general principles, we conclude that the Iowa truck-length limitations unconstitutionally burden interstate commerce.

In *Raymond Motor Transportation, Inc.* v. *Rice,* the Court held that a Wisconsin statute that precluded the use of 65-foot doubles violated the Commerce Clause. This case is *Raymond* revisited. Here, as in *Raymond,* the State failed to present any persuasive evidence that 65-foot doubles are less safe than 55-foot singles. Moreover, Iowa's law is now out of step with the laws of all other Midwestern and Western States. Iowa thus substantially burdens the interstate flow of goods by truck. In the absence of congressional action to set uniform standards,[11] some burdens associated with state safety regulations must be tolerated. But where, as here, the State's safety interest has been found to be illusory, and its regulations impair significantly the federal interest in efficient and safe interstate transportation, the state law cannot be harmonized with the Commerce Clause.[12]

## A

Iowa made a more serious effort to support the safety rationale of its law than did Wisconsin in *Raymond,* but its

---

[11] The Senate last year passed a bill that would have pre-empted the field of truck lengths by setting a national limit of 65 feet. See S. 1390, 96th Cong., 2d Sess. (1980) (reprinted in 126 Cong. Rec. 3309, 3303 (1980)). The House took no action before adjournment.

[12] It is highly relevant that here, as in *Raymond,* the state statute contains exemptions that weaken the deference traditionally accorded to a state safety regulation. See Part IV, *infra.*

effort was no more persuasive. As noted above, the District Court found that the "evidence clearly establishes that the twin is as safe as the semi." The record supports this finding.

The trial focused on a comparison of the performance of the two kinds of trucks in various safety categories. The evidence showed, and the District Court found, that the 65-foot double was at least the equal of the 55-foot single in the ability to brake, turn, and maneuver. The double, because of its axle placement, produces less splash and spray in wet weather.[13] And, because of its articulation in the middle, the double is less susceptible to dangerous "off-tracking," [14] and to wind.

None of these findings is seriously disputed by Iowa. Indeed, the State points to only three ways in which the 55-foot single is even arguably superior: singles take less time to be passed and to clear intersections; they may back up for longer distances; and they are somewhat less likely to jackknife.

The first two of these characteristics are of limited relevance on modern interstate highways. As the District Court found, the negligible difference in the time required to pass, and to cross intersections, is insignificant on 4-lane divided highways because passing does not require crossing into oncoming traffic lanes, *Raymond*, 434 U. S., at 444, and interstates have few, if any, intersections. The concern over backing capability also is insignificant because it seldom is necessary to back up

---

[13] Twin trailers have single axles; semis, by contrast, have tandem axles. The axle configuration of the semi aggravates splash and spray. The forward tire creates upward wind currents in the same place that the rear tire creates downward wind currents. The confluence of these currents occurs at a point just above and between the tandem axles. The resulting turbulence then is blasted outward, carrying spray with it. App. 95–96.

[14] "Off-tracking" refers to the extent to which the rear wheels of a truck deviate from the path of the front wheels while turning.

on an interstate.[15]   In any event, no evidence suggested any difference in backing capability between the 60-foot doubles that Iowa permits and the 65-foot doubles that it bans.   Similarly, although doubles tend to jackknife somewhat more than singles, 65-foot doubles actually are less likely to jackknife than 60-foot doubles.

Statistical studies supported the view that 65-foot doubles are at least as safe overall as 55-foot singles and 60-foot doubles.   One such study, which the District Court credited, reviewed Consolidated's comparative accident experience in 1978 with its own singles and doubles.   Each kind of truck was driven 56 million miles on identical routes.   The singles were involved in 100 accidents resulting in 27 injuries and one fatality.   The 65-foot doubles were involved in 106 accidents resulting in 17 injuries and one fatality.   Iowa's expert statistician admitted that this study provided "moderately strong evidence" that singles have a higher injury rate than doubles. App. 488.   Another study, prepared by the Iowa Department of Transportation at the request of the state legislature, concluded that "[s]ixty-five foot twin trailer combinations have *not* been shown by experiences in other states to be less safe than 60 foot twin trailer combinations *or* conventional tractor-semitrailers" (emphasis in original). *Id.*, at 584. Numerous insurance company executives, and transportation officials from the Federal Government and various States, testified that 65-foot doubles were at least as safe as 55-foot singles.   Iowa concedes that it can produce no study that establishes a statistically significant difference in safety between the 65-foot double and the kinds of vehicles the State permits.   Brief for Appellants 28, 32.   Nor, as the District Court noted, did Iowa present a single witness who testified that 65-foot doubles were more dangerous overall than the vehicles permitted under Iowa law.   475 F. Supp., at 549.

---

[15] Evidence at trial did show that doubles could back up far enough to move around an accident.   App. 103.

In sum, although Iowa introduced more evidence on the question of safety than did Wisconsin in *Raymond,* the record as a whole was not more favorable to the State.[16]

## B

Consolidated, meanwhile, demonstrated that Iowa's law substantially burdens interstate commerce. Trucking companies that wish to continue to use 65-foot doubles must route them around Iowa or detach the trailers of the doubles and ship them through separately. Alternatively, trucking companies must use the smaller 55-foot singles or 60-foot doubles permitted under Iowa law. Each of these options engenders inefficiency and added expense. The record shows that Iowa's law added about $12.6 million each year to the costs of trucking companies. Consolidated alone incurred about $2 million per year in increased costs.

In addition to increasing the costs of the trucking companies (and, indirectly, of the service to consumers), Iowa's law may aggravate, rather than ameliorate, the problem of highway accidents. Fifty-five foot singles carry less freight than 65-foot doubles. Either more small trucks must be used to carry the same quantity of goods through Iowa, or the same number of larger trucks must drive longer distances to bypass Iowa. In either case, as the District Court noted,

---

[16] In suggesting that Iowa's law actually promotes safety, the dissenting opinion ignores the findings of the courts below and relies on largely discredited statistical evidence. The dissent implies that a statistical study identified doubles as more dangerous than singles. *Post,* at 695. At trial, however, the author of that study—Iowa's own statistician—conceded that his calculations were statistically biased, and therefore "not very meaningful." Tr. 1678; see App. 669-670, Tr. 1742-1747.

The dissenting opinion also suggests that its conclusions are bolstered by the fact that the American Association of State Highway and Transportation Officials (AASHTO) recommends that States limit truck lengths. *Post,* at 693, 699. The dissent fails to point out, however, that AASHTO specifically recommends that States permit 65-foot doubles. App. 602-603.

the restriction requires more highway miles to be driven to transport the same quantity of goods. Other things being equal, accidents are proportional to distance traveled. See App. 604, 615.[17] Thus, if 65-foot doubles are as safe as 55-foot singles, Iowa's law tends to *increase* the number of accidents, and to shift the incidence of them from Iowa to other States.[18]

## IV

Perhaps recognizing the weakness of the evidence supporting its safety argument, and the substantial burden on commerce that its regulations create, Iowa urges the Court simply to "defer" to the safety judgment of the State. It argues that the length of trucks is generally, although perhaps imprecisely, related to safety. The task of drawing a line is one that Iowa contends should be left to its legislature.

The Court normally does accord "special deference" to state highway safety regulations. *Raymond,* 434 U. S., at 444, n. 18. This traditional deference "derives in part from the assumption that where such regulations do not discriminate on their face against interstate commerce, their burden usually falls on local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations." *Ibid.* Less deference to the legislative judg-

---

[17] Moreover, trucks diverted from interstates often must travel over more dangerous roads. For example, east-west traffic diverted from Interstate 80 is rerouted through Missouri on U. S. Highway 36, which is predominantly a 2-lane road.

[18] The District Court, in denying a stay pending appeal, noted that Iowa's law causes "more accidents, more injuries, more fatalities and more fuel consumption." *Id.,* at 579. Appellant Kassel conceded as much at trial. *Id.,* at 281. Kassel explained, however, that most of these additional accidents occur in States other than Iowa because truck traffic is deflected around the State. He noted: "Our primary concern is the citizens of Iowa and our own highway system we operate in this state." *Ibid.*

ment is due, however, where the local regulation bears disproportionately on out-of-state residents and businesses. Such a disproportionate burden is apparent here. Iowa's scheme, although generally banning large doubles from the State, nevertheless has several exemptions that secure to Iowans many of the benefits of large trucks while shunting to neighboring States many of the costs associated with their use.[19]

At the time of trial there were two particularly significant exemptions. First, singles hauling livestock or farm vehicles were permitted to be as long as 60 feet. Iowa Code §§ 321.457 (5), 321.457 (3) (1979). As the Court of Appeals noted, this provision undoubtedly was helpful to local interests. Cf. *Raymond, supra,* at 434 (exemption in Wisconsin for milk shippers). Second, cities abutting other States were permitted to enact local ordinances adopting the larger length limitation of the neighboring State. Iowa Code § 321.457 (7) (1979). This exemption offered the benefits of longer trucks to individuals and businesses in important border cities[20] without burdening Iowa's highways with interstate through traffic.[21] Cf. *Raymond, supra,* at 446–447, and n. 24 (exemption in Wisconsin for shipments from local plants).[22]

---

[19] As the District Court noted, diversion of traffic benefits Iowa by holding down (i) accidents in the State, (ii) auto insurance premiums, (iii) police staffing needs, and (iv) road wear. 475 F. Supp., at 550.

[20] Five of Iowa's ten largest cities—Davenport, Sioux City, Dubuque, Council Bluffs, and Clinton—are by their location entitled to use the "border cities exemption." See U. S. Bureau of the Census, U. S. Census of Population: 1970 Number of Inhabitants, Final Report, PC (1)–A1, United States Summary 1–136, 1–137.

[21] The vast majority of the 65-foot doubles seeking access to Iowa's interstate highways carry goods in interstate traffic through Iowa. See App. 175–176, 560.

[22] As noted above, exemptions also are available to benefit Iowa truck makers, Iowa Code § 321E.10 (1979), and Iowa mobile home manufacturers

The origin of the "border cities exemption" also suggests that Iowa's statute may not have been designed to ban dangerous trucks, but rather to discourage interstate truck traffic. In 1974, the legislature passed a bill that would have permitted 65-foot doubles in the State. See n. 6, *supra.* Governor Ray vetoed the bill. He said:

> "I find sympathy with those who are doing business in our state and whose enterprises could gain from increased cargo carrying ability by trucks. However, with this bill, the Legislature has pursued a course that would benefit only a few Iowa-based companies while providing a great advantage for out-of-state trucking firms and competitors at the expense of our Iowa citizens." App. 626.[23]

After the veto, the "border cities exemption" was immediately enacted and signed by the Governor.

It is thus far from clear that Iowa was motivated primarily by a judgment that 65-foot doubles are less safe than 55-foot singles. Rather, Iowa seems to have hoped to limit the use of its highways by deflecting some through traffic.[24] In the District Court and Court of Appeals, the State explicitly at-

---

or purchasers, § 321E.28 (5). Although these exemptions are not directly relevant to the controversy over the safety of 65-foot doubles, they do contribute to the pattern of parochialism apparent in Iowa's statute.

[23] Governor Ray further commented that "if we have thousands more trucks crossing our state, there will be millions of additional miles driven in Iowa and that does create a genuine concern for safety." App. 628.

[24] The dissenting opinion insists that we defer to Iowa's truck-length limitations because they represent the collective judgment of the Iowa Legislature. See *post,* at 691–692, 696–697, 699, 700. This position is curious because, as noted above, the Iowa Legislature approved a bill legalizing 65-foot doubles. The bill was vetoed by the Governor, primarily for parochial rather than legitimate safety reasons. The dissenting opinion is at a loss to explain the Governor's interest in deflecting interstate truck traffic around Iowa.

temped to justify the law by its claimed interest in keeping trucks out of Iowa. See n. 9 and accompanying text, *supra.* The Court of Appeals correctly concluded that a State cannot constitutionally promote its own parochial interests by requiring safe vehicles to detour around it. 612 F. 2d, at 1070.

V

In sum, the statutory exemptions, their history, and the arguments Iowa has advanced in support of its law in this litigation, all suggest that the deference traditionally accorded a State's safety judgment is not warranted. See *Raymond, supra,* at 444, and n. 18, 446–447.[25] The controlling factors thus are the findings of the District Court, accepted by the Court of Appeals, with respect to the relative safety of the types of trucks at issue, and the substantiality of the burden on interstate commerce.

Because Iowa has imposed this burden without any significant countervailing safety interest,[26] its statute violates the

---

[25] *Locomotive Firemen* v. *Chicago, R. I. & P. R. Co.,* 393 U. S. 129 (1968), in its result, although perhaps not in all of its language, is consistent with the conclusion we reach today. There, the Arkansas "full-crew" laws were upheld against constitutional challenge because the Court easily perceived that they made nonillusory contributions to safety. See *id.,* at 136–138. Here, as in *Raymond,* there was no such evidence. This case and *Raymond* recognize, as the Court did in *Locomotive Firemen,* that States constitutionally may enact laws that demonstrably promote safety, even when those laws also burden the flow of commerce.

[26] As noted above, the District Court and the Court of Appeals held that the Iowa statutory scheme unconstitutionally burdened interstate commerce. The District Court, however, found that the statute did not discriminate against such commerce. 475 F. Supp., at 553. Because the record fully supports the decision below with respect to the burden on interstate commerce, we need not consider whether the statute also operated to discriminate against that commerce. See *Raymond,* 434 U. S., at 446–447, n. 24. The latter theory was neither briefed nor argued in this Court.

Commerce Clause.[27]   The judgment of the Court of Appeals is affirmed.[28]

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

Iowa's truck-length regulation challenged in this case is nearly identical to the Wisconsin regulation struck down in *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429 (1978), as in violation of the Commerce Clause.   In my view the same Commerce Clause restrictions that dictated that holding also require invalidation of Iowa's regulation insofar as it prohibits 65-foot doubles.

The reasoning bringing me to that conclusion does not require, however, that I engage in the debate between my Brothers POWELL and REHNQUIST over what the District Court record shows on the question whether 65-foot doubles are more dangerous than shorter trucks.   With all respect, my Brothers ask and answer the wrong question.

For me, analysis of Commerce Clause challenges to state regulations must take into account three principles: (1) The courts are not empowered to second-guess the empirical judgments of lawmakers concerning the utility of legislation.

[27] JUSTICE REHNQUIST in dissent states that, as he reads the various opinions in this case, "only four Justices invalidate Iowa's law on the basis of the analysis in *Raymond." Post,* at 700, n. 10.   It should be emphasized that *Raymond,* the analysis of which was derived from the Court's opinion in *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970), was joined by each of the eight Justices who participated.   Today, JUSTICE BRENNAN finds it unnecessary to reach the *Raymond* analysis because he finds the Iowa statute to be flawed for a threshold reason.

[28] Consolidated's complaint sought only a declaration that the Iowa statute was unconstitutional insofar as it precluded the use of 65-foot doubles on major interstate highways and nearby access roads.   App. 10–11.   We are not asked to consider whether Iowa validly may ban 65-foot doubles from smaller roads on which they might be demonstrably unsafe.

(2) The burdens imposed on commerce must be balanced against the local benefits actually sought to be achieved by the State's lawmakers, and not against those suggested after the fact by counsel. (3) Protectionist legislation is unconstitutional under the Commerce Clause, even if the burdens and benefits are related to safety rather than economics.

## I

Both the opinion of my Brother POWELL and the opinion of my Brother REHNQUIST are predicated upon the supposition that the constitutionality of a state regulation is determined by the factual record created by the State's lawyers in trial court. But that supposition cannot be correct, for it would make the constitutionality of state laws and regulations depend on the vagaries of litigation rather than on the judgments made by the State's lawmakers.

In considering a Commerce Clause challenge to a state regulation, the judicial task is to balance the burden imposed on commerce against the local benefits sought to be achieved by the State's *lawmakers*. See *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). In determining those benefits, a court should focus ultimately on the regulatory purposes identified by the lawmakers and on the evidence before or available to them that might have supported their judgment. See generally *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 464, 473 (1981). Since the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation, the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes. See *Locomotive Firemen* v. *Chicago, R. I. & P. R. Co.*, 393 U. S. 129, 138–139 (1968); *South Carolina State Highway Dept.* v. *Barnwell Bros., Inc.*, 303 U. S. 177, 192–193 (1938). It is not the function of the court to decide whether *in fact* the regulation promotes its intended purpose, so long as an examination of the evidence before or available to the lawmaker indicates

that the regulation is not wholly irrational in light of its purposes. See *Minnesota* v. *Clover Leaf Creamery Co., supra,* at 469, 473.[1]

## II

My Brothers POWELL and REHNQUIST make the mistake of disregarding the intention of Iowa's lawmakers and assuming that resolution of the case must hinge upon the argument offered by Iowa's attorneys: that 65-foot doubles are more dangerous than shorter trucks. They then canvass the factual record and findings of the courts below and reach opposite conclusions as to whether the evidence adequately supports that empirical judgment. I repeat: my Brothers POWELL and REHNQUIST have asked and answered the wrong question. For although Iowa's lawyers in this litigation have defended the truck-length regulation on the basis of the safety advantages of 55-foot singles and 60-foot doubles over 65-foot doubles, Iowa's actual rationale for maintaining the regulation had nothing to do with these purported differences. Rather, Iowa sought to discourage interstate truck traffic on Iowa's high-

---

[1] Moreover, I would emphasize that in the field of safety—and perhaps in other fields where the decisions of state lawmakers are deserving of a heightened degree of deference—the role of the courts is not to balance asserted burdens against intended benefits as it is in other fields. Compare *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S. 429, 449 (1978) (BLACKMUN, J., concurring) (safety regulation), with *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 143 (1970) (regulation intended "to protect and enhance the reputation of growers within the State"). In the field of safety, once the court has established that the intended safety benefit is not illusory, insubstantial, or nonexistent, it must defer to the State's lawmakers on the appropriate balance to be struck against other interests. I therefore disagree with my Brother POWELL when he asserts that the degree of interference with interstate commerce may in the first instance be "weighed" against the State's safety interests:

"Regulations designed [to promote the public health or safety] nevertheless may further the purpose so marginally, *and interfere with commerce so substantially,* as to be invalid under the Commerce Clause." *Ante,* at 670 (emphasis added).

ways.[2] Thus, the safety advantages and disadvantages of the types and lengths of trucks involved in this case are irrelevant to the decision.[3]

---

[2] In the District Court and the Court of Appeals, Iowa's attorneys forthrightly defended the regulation in part on the basis of the State's interest in discouraging interstate truck traffic through Iowa. 475 F. Supp. 544, 550 (SD Iowa); 612 F. 2d 1064, 1069 (CA8 1979).

[3] My Brother REHNQUIST claims that the "argument" that a court should defer to the actual purposes of the lawmakers rather than to the *post hoc* justifications of counsel "has been consistently rejected by the Court in other contexts." *Post,* at 702. Apparently, he has overlooked such cases as *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522 (1959), where we described the rationale for our earlier decision in *Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562 (1949):

"The statutes, on their face admittedly discriminatory against nonresidents, themselves declared their purpose. . . . Having themselves specifically declared their purpose, the Ohio statute left no room to conceive of any other purpose for their existence. And the declared purpose having been found arbitrarily discriminatory against nonresidents, the Court could hardly escape the conclusion . . . ." 358 U. S., at 529–530.

And in *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648, n. 16 (1975), we said:

"This Court need not . . . accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation." (Citing cases.)

And in *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976), we stated that a classification challenged as being discriminatory will be upheld only if it "rationally furthers the purpose identified by the State." See also *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 463, n. 7 (1981); *Califano* v. *Goldfarb,* 430 U. S. 199, 212–213 (1977) (plurality opinion); *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 813, n. 23 (1976); *Johnson* v. *Robison,* 415 U. S. 361, 381–382 (1974).

The extent to which we may rely upon *post hoc* justifications of counsel depends on the circumstances surrounding passage of the legislation. Where there is no evidence bearing on the actual purpose for a legislative classification, our analysis necessarily focuses on the suggestions of counsel, see *Allied Stores of Ohio, Inc.* v. *Bowers, supra,* at 528–529 (relied upon by the dissent, *post,* at 703–704, n. 13). Even then, "marginally more demanding scrutiny" is appropriate to "test the plausibility of the tendered

My Brother POWELL concedes that "[i]t is . . . far from clear that Iowa was motivated primarily by a judgment that 65-foot doubles are less safe than 55-foot singles. Rather, Iowa seems to have hoped to limit the use of its highways by deflecting some through traffic." *Ante,* at 677. This conclusion is more than amply supported by the record and the legislative history of the Iowa regulation. The Iowa Legislature has consistently taken the position that size, weight, and speed restrictions on interstate traffic should be set in accordance with uniform national standards. The stated purpose was not to further safety but to achieve uniformity with other States. The Act setting the limitations challenged in

purpose." *Schweiker* v. *Wilson, ante,* at 245 (POWELL, J., dissenting). But where the lawmakers' purposes in enacting a statute are explicitly set forth, *e. g., Minnesota* v. *Clover Leaf Creamery Co., supra,* at 458–459; *Johnson* v. *Robison, supra,* at 376, or are clearly discernible from the legislative history, *e. g., Hughes* v. *Alexandria Scrap Corp., supra,* at 813, n. 23; *McGinnis* v. *Royster,* 410 U. S. 263, 274–277 (1973), this Court should not take—and, with the possible exception of *United States Railroad Retirement Board* v. *Fritz,* 449 U. S. 166 (1980), see *id.,* at 187–193 (BRENNAN, J., dissenting), has not taken—the extraordinary step of disregarding the *actual* purpose in favor of some "imaginary basis or purpose." *McGinnis* v. *Royster, supra,* at 277. The principle of separation of powers requires, after all, that we defer to the elected lawmakers' judgment as to the appropriate means to accomplish an end, not that we defer to the arguments of lawyers.

If, as here, the only purpose ever articulated by the State's lawmakers for maintaining a regulation is illegitimate, I consider it contrary to precedent as well as to sound principles of constitutional adjudication for the courts to base their analysis on purposes never conceived by the lawmakers. This is especially true where, as the dissent's strained analysis of the relative safety of 65-foot doubles to shorter trucks amply demonstrates, see *post,* at 694–696, the *post hoc* justifications are implausible as well as imaginary. I would emphasize that, although my Brother POWELL's plurality opinion does not give as much weight to the illegitimacy of Iowa's actual purpose as I do, see Part III, *infra,* both that opinion and this concurrence have found the actual motivation of the Iowa lawmakers in maintaining the truck-length regulation highly relevant to, if not dispositive of, the case. See *ante,* at 677–678.

this case, passed in 1947 and periodically amended since then, is entitled "An Act *to promote uniformity with other states* in the matter of limitations on the size, weight and speed of motor vehicles . . . ." 1947 Iowa Acts, ch. 177 (emphasis added). Following the proposals of the American Association of State Highway and Transportation Officials, the State has gradually increased the permissible length of trucks from 45 feet in 1947 to the present limit of 60 feet.

In 1974, the Iowa Legislature again voted to increase the permissible length of trucks to conform to uniform standards then in effect in most other States. This legislation, House Bill 671, would have increased the maximum length of twin trailer trucks operable in Iowa from 60 to 65 feet. But Governor Ray broke from prior state policy, and vetoed the legislation. The legislature did not override the veto, and the present regulation was thus maintained. In his veto,[4] Governor Ray did not rest his decision on the conclusion that 55-foot singles and 60-foot doubles are any safer than 65-foot doubles, or on any other safety consideration inherent in the type or size of the trucks. Rather, his principal concern was that to allow 65-foot doubles would "basically ope[n] our state to literally thousands and thousands more trucks per year." App. 628. This increase in interstate truck traffic would, in the Governor's estimation, greatly increase highway maintenance costs, which are borne by the citizens of the State, *id.,* at 628–629, and increase the number of accidents and fatalities within the State. *Id.,* at 628. The legislative response was not to override the veto, but to accede to the Governor's action, and in accord with his basic premise, to enact a "border cities exemption." This permitted cities within border areas to allow 65-foot doubles while otherwise maintaining the 60-foot limit throughout the State to discourage interstate truck traffic.

---

[4] The veto message, printed at App. 626–631, is a complete statement of Governor Ray's reasons for vetoing House Bill 671. App. 172 (deposition of Governor Ray).

Although the Court has stated that "[i]n no field has . . . deference to state regulation been greater than that of highway safety," *Raymond Motor Transportation, Inc.* v. *Rice*, 434 U. S., at 443, it has declined to go so far as to presume that size restrictions are inherently tied to public safety. *Id.*, at 444, n. 19. The Court has emphasized that the "strong presumption of validity" of size restrictions "cannot justify a court in closing its eyes to uncontroverted evidence of record," *ibid.*,—here the obvious fact that the safety characteristics of 65-foot doubles· did not provide the motivation for either legislators or Governor in maintaining the regulation.

## III

Though my Brother Powell recognizes that the State's actual purpose in maintaining the truck-length regulation was "to limit the use of its highways by deflecting some through traffic," *ante*, at 677, he fails to recognize that this purpose, being *protectionist* in nature, is *impermissible* under the Commerce Clause.[5] The Governor admitted that he blocked legislative efforts to raise the length of trucks because the change "would benefit only a few Iowa-based companies while providing a great advantage for out-of-state trucking firms and competitors at the expense of our Iowa citizens." App. 626; see also *id.*, at 185–186. Appellant Raymond Kassel, Director of the Iowa Department of Transportation, while admitting that the greater 65-foot length standard would be *safer* overall, defended the more restrictive regulations because of their benefits *within Iowa:*

"Q: Overall, there would be fewer miles of operation, fewer accidents and fewer fatalities?

"A: Yes, on the national scene.

"Q: Does it not concern the Iowa Department of

---

[5] It is not enough to conclude, as my Brother Powell does, that "the deference traditionally accorded a State's safety judgment is not warranted." *Ante*, at 678.

Transportation that banning 65-foot twins causes more accidents, more injuries and more fatalities?

"A: Do you mean outside of our state border?

"Q: Overall.

"A: Our primary concern is the citizens of Iowa and our own highway system we operate in this state." *Id.,* at 281.

The regulation has had its predicted effect. As the District Court found:

"Iowa's length restriction causes the trucks affected by the ban to travel more miles over more dangerous roads in other states which means a greater overall exposure to accidents and fatalities. More miles of highway are subjected to wear. More fuel is consumed and greater transportation costs are incurred." 475 F. Supp. 544, 550 (SD Iowa 1979).

Iowa may not shunt off its fair share of the burden of maintaining interstate truck routes, nor may it create increased hazards on the highways of neighboring States in order to decrease the hazards on Iowa highways. Such an attempt has all the hallmarks of the "simple . . . protectionism" this Court has condemned in the economic area. *Philadelphia* v. *New Jersey,* 437 U. S. 617, 624 (1978). Just as a State's attempt to avoid interstate competition in economic goods may damage the prosperity of the Nation as a whole, so Iowa's attempt to deflect interstate truck traffic has been found to make the Nation's highways as a whole more hazardous. That attempt should therefore be subject to "a virtually *per se* rule of invalidity." *Ibid.*

This Court's heightened deference to the judgments of state lawmakers in the field of safety, see *ante,* at 670, is largely attributable to a judicial disinclination to weigh the interests of safety against other societal interests, such as the economic interest in the free flow of commerce. Thus, "if safety justifications are not illusory, the Court will not second-

guess legislative judgment about their importance *in comparison with related burdens on interstate commerce."* *Raymond Motor Transportation, Inc.* v. *Rice, supra,* at 449 (BLACKMUN, J., concurring) (emphasis added). Here, the decision of Iowa's lawmakers to promote *Iowa's* safety and other interests at the direct expense of the safety and other interests of neighboring States merits no such deference. No special judicial acuity is demanded to perceive that this sort of parochial legislation violates the Commerce Clause. As Justice Cardozo has written, the Commerce Clause "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 523 (1935).

I therefore concur in the judgment.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE STEWART join, dissenting.

The result in this case suggests, to paraphrase Justice Jackson, that the only state truck-length limit "that is valid is one which this Court has not been able to get its hands on." *Jungersen* v. *Ostby & Barton Co.,* 335 U. S. 560, 572 (1949) (dissenting opinion). Although the plurality opinion and the opinion concurring in the judgment strike down Iowa's law by different routes, I believe the analysis in both opinions oversteps our "limited authority to review state legislation under the commerce clause," *Locomotive Firemen* v. *Chicago, R. I. & P. R. Co.,* 393 U. S. 129, 136 (1968), and seriously intrudes upon the fundamental right of the States to pass laws to secure the safety of their citizens. Accordingly, I dissent.

## I

It is necessary to elaborate somewhat on the facts as presented in the plurality opinion to appreciate fully what the Court does today. Iowa's action in limiting the length of trucks which may travel on its highways is in no sense un-

usual. Every State in the Union regulates the length of vehicles permitted to use the public roads. Nor is Iowa a renegade in having length limits which operate to exclude the 65-foot doubles favored by Consolidated. These trucks are prohibited in other areas of the country as well, some 17 States and the District of Columbia, including all of New England and most of the Southeast.[1] While pointing out that Consolidated carries commodities through Iowa on Interstate 80, "the principal east-west route linking New York, Chicago, and the west coast," *ante,* at 665, the plurality neglects to note that both Pennsylvania and New Jersey, through which Interstate 80 runs before reaching New York, also ban 65-foot doubles. In short, the persistent effort in the plurality opinion to paint Iowa as an oddity standing alone to block commerce carried in 65-foot doubles is simply not supported by the facts.

Nor does the plurality adequately convey the extent to which the lower courts permitted the 65-foot doubles to operate in Iowa. Consolidated sought to have the 60-foot length limit declared an unconstitutional burden on commerce when applied to the seven Interstate Highways in Iowa [2] and "access routes to and from Plaintiff's terminals, and reasonable access from said Interstate Highways to facilities for food, fuel, repairs, or rest." App. 10. The lower courts granted this relief, permitting the 65-foot doubles to travel *off the Interstates* as far as five miles for access to terminal and

---

[1] Doubles are prohibited in Maine, New Hampshire, Vermont, Massachusetts (except turnpike), Rhode Island, Connecticut, Pennsylvania, West Virginia, Virginia, Tennessee, North Carolina, South Carolina, Alabama, and the District of Columbia. Doubles are permitted to a maximum length of 55 feet in New York (on designated highways only, longer permitted on turnpike), New Jersey, Mississippi, and Georgia. Sixty-five-foot doubles are restricted to designated highways in Oregon, North Dakota, Minnesota, Wisconsin, Michigan, Illinois, Missouri, Louisiana, Kentucky, Maryland, and Florida. See App. 605, 645.

[2] Interstate Highways 80, 35, 280, 380, 29, 680, and 235.

other facilities, or less if closer facilities were available. 475 F. Supp. 544, 553–554 (SD Iowa 1979). To the extent the plurality relies on characteristics of the Interstate Highways in rejecting Iowa's asserted safety justifications, see *ante,* at 672–673, it fails to recognize the scope of the District Court order it upholds.

With these additions to the relevant facts, we can now examine the appropriate analysis to be applied.

## II

Casual readers of this Court's Commerce Clause decisions may be surprised, upon turning to the Constitution itself, to discover that the Clause in question simply provides that "The Congress shall have Power . . . To regulate Commerce . . . among the several States." Art. I, § 8, cl. 3. Although it is phrased in terms of an affirmative grant of power to the National Legislature, we have read the Commerce Clause as imposing some limitations on the States as well, even in the absence of any action by Congress. See *Philadelphia* v. *New Jersey,* 437 U. S. 617, 623 (1978). The Court has hastened to emphasize, however, that the negative implication it has discerned in the Commerce Clause does not invalidate state legislation simply because the legislation burdens interstate commerce.

> "In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 443–444 (1960) (quoting *Sherlock* v. *Alling,* 93 U. S. 99, 103 (1876)).

See *Raymond Motor Transportation, Inc.* v. *Rice,* 434 U. S.

429, 440 (1978); *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 767 (1945). The Commerce Clause is, after all, a grant of authority to Congress, not to the courts. Although the Court when it interprets the "dormant" aspect of the Commerce Clause will invalidate unwarranted state intrusion, such action is a far cry from simply undertaking to regulate when Congress has not because we believe such regulation would facilitate interstate commerce. Cf. *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 302 (1944) (Black, J., concurring) ("The Constitution gives [Congress] the power to regulate commerce among the states, and until it acts I think we should enter the field with extreme caution").

It is also well established that "the Court has been most reluctant to invalidate under the Commerce Clause 'state legislation in the field of safety where the propriety of local regulation has long been recognized.'" *Raymond, supra,* at 443 (quoting *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 143 (1970)). The propriety of state regulation of the use of public highways was explicitly recognized in *Morris* v. *Duby,* 274 U. S. 135, 143 (1927), where Chief Justice Taft wrote that "[i]n the absence of national legislation especially covering the subject of interstate commerce, the State may rightfully prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens." The Court very recently reaffirmed the longstanding view that "[i]n no field has . . . deference to state regulation been greater than that of highway safety." *Raymond, supra,* at 443. See *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 111 (1949); *South Carolina State Highway Dept.* v. *Barnwell Brothers, Inc.,* 303 U. S. 177, 187 (1938); *Sproles* v. *Binford,* 286 U. S. 374, 390 (1932); *Hendrick* v. *Maryland,* 235 U. S. 610, 622 (1915). Those challenging a highway safety regulation must overcome a "strong presumption of validity," *Bibb* v. *Navajo Freight Lines, Inc.,* 359 U. S. 520, 524 (1959), particularly

when, as here, Congress has not acted in the area and the claim is that "the bare possession of power by Congress" invalidates the state legislation. *Barnwell Brothers, supra,* at 187.[3]

A determination that a state law is a rational safety measure does not end the Commerce Clause inquiry. A "sensitive consideration" of the safety purpose in relation to the burden on commerce is required. *Raymond, supra,* at 441. When engaging in such a consideration the Court does not directly compare safety benefits to commerce costs and strike down the legislation if the latter can be said in some vague sense to "outweigh" the former. Such an approach would make an empty gesture of the strong presumption of validity accorded state safety measures, particularly those governing highways. It would also arrogate to this Court functions of forming public policy, functions which, in the absence of congressional action, were left by the Framers of the Constitution to state legislatures. "[I]n reviewing a state highway regulation where Congress has not acted, a court is not called upon, as are state legislatures, to determine what, in its judgment, is the most suitable restriction to be applied of those that are possible, or to choose that one which in its opinion is best adapted to all the diverse interests affected." *Barnwell Brothers, supra,* at 190. See *Locomotive Firemen,* 393 U. S., at 138 ("[T]he question of safety in the circumstances of this case is essentially a matter of public policy, and public policy can, under our constitutional system, be fixed only by the people acting through their elected representatives"); *Bibb, supra,* at 524 ("If there are alternative ways of solving a problem, we do not sit to determine which of them is best

---

[3] Congress has considered the question of regulating truck length several times but has consistently left the matter for state regulation. See, *e. g.,* S. Rep. No. 93–1111, p. 10 (1974) ("The Committee believes that truck lengths should remain, as they have been, a matter for State decision").

suited to achieve a valid state objective. Policy decisions are for the state legislature"). These admonitions are peculiarly apt when, as here, the question involves the difficult comparison of financial losses and "the loss of lives and limbs of workers and people using the highways." *Locomotive Firemen, supra,* at 140.[4]

The purpose of the "sensitive consideration" referred to above is rather to determine if the asserted safety justification, although rational, is merely a pretext for discrimination against interstate commerce. We will conclude that it is if the safety benefits from the regulation are demonstrably trivial while the burden on commerce is great. Thus the Court in *Bibb* stated that the "strong presumption of validity" accorded highway safety measures could be overcome only when the safety benefits were "slight or problematical," 359 U. S., at 524. See *Raymond,* 434 U. S., at 449 (BLACKMUN, J., concurring) ("[I]f safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce"). The nature of the inquiry is perhaps best illustrated by examining those cases in which state safety laws have been struck down on Commerce Clause grounds. In *Southern Pacific* a law regulating train lengths was viewed by the Court as having "at most slight and dubious advantage, if any, over unregulated train lengths," 325 U. S., at 779; the lower courts concluded the law actually tended to *increase* the number of accidents by increasing the number of trains, *id.,* at 777. In *Bibb* the contoured mudguards re-

---

[4] It should not escape notice that a majority of the Court goes on record today as agreeing that courts in Commerce Clause cases do not sit to weigh safety benefits against burdens on commerce when the safety benefits are not illusory. See opinion concurring in judgment, *ante,* at 681, n. 1. Even the plurality gives lipservice to this principle, *ante,* at 670. I do not agree with my Brother BRENNAN, however, that only those safety benefits somehow articulated by the legislature as *the* motivation for the challenged statute can be considered in supporting the state law. See *infra,* at 702–703.

quired by Illinois, alone among the States, had *no* safety advantages over conventional mudguards and, as in *Southern Pacific,* actually *increased* hazards. 359 U. S., at 525; *id.,* at 530 (Harlan, J., concurring). In *Great A&P Tea Co.* v. *Cottrell,* 424 U. S. 366, 375–376 (1976), the Court struck down a Mississippi "reciprocity clause" concerning milk inspection because it "disserve[d] rather than promote[d] any higher Mississippi milk quality standards." The cases thus demonstrate that the safety benefits of a state law must be slight indeed before it will be struck down under the dormant Commerce Clause.

## III

Iowa defends its statute as a highway safety regulation. There can be no doubt that the challenged statute is a valid highway safety regulation and thus entitled to the strongest presumption of validity against Commerce Clause challenges. As noted, all 50 States regulate the length of trucks which may use their highways. Cf. *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, 399 (1937) ("The adoption of similar requirements by many States evidences a deepseated conviction both as to the presence of the evil and as to the means adapted to check it"). The American Association of State Highway and Transportation Officials (AASHTO) has consistently recommended length as well as other limits on vehicles.[5] The Iowa Supreme Court has long viewed the provision in question as intended to promote highway safety, see *Wood Brothers Thresher Co.* v. *Eicher,* 231 Iowa 550, 559–560, 1 N. W. 2d 655, 660 (1942); *State* v. *United-Buckingham Freight Lines, Inc.,* 211 N. W. 2d 288, 290 (1973), and "[t]his Court has also had occasion to point out that the sizes and weights of automobiles have an important relation

---

[5] The plurality points out that "AASHTO specifically recommends that States permit 65-foot doubles," *ante,* at 674, n. 16. But in the absence of its adoption by the Iowa legislative process, an AASHTO recommendation as to a particular length limit remains exactly that: a recommendation which no State is bound to follow.

to the safe and convenient use of the highways, which are matters of state control." *Maurer* v. *Hamilton,* 309 U. S. 598, 609 (1940). There can also be no question that the particular limit chosen by Iowa—60 feet—is rationally related to Iowa's safety objective. Most truck limits are between 55 and 65 feet, see App. 645, and Iowa's choice is thus well within the widely accepted range.

Iowa adduced evidence supporting the relation between vehicle length and highway safety. The evidence indicated that longer vehicles take greater time to be passed, thereby increasing the risks of accidents, particularly during the inclement weather not uncommon in Iowa. *Id.,* at 504–505. The 65-foot vehicle exposes a passing driver to visibility-impairing splash and spray during bad weather for a longer period than do the shorter trucks permitted in Iowa.[6] Longer trucks are more likely to clog intersections, *id.,* at 457, and although there are no intersections on the Interstate Highways, the order below went beyond the highways themselves and the concerns about greater length at intersections would arise "[a]t every trip origin, every trip destination, every intermediate stop for picking up trailers, reconfiguring loads, change of drivers, eating, refueling—every intermediate stop would generate this type of situation." *Ibid.* The Chief of the Division of

---

[6] Although greater passing time was offered as a safety justification in *Raymond,* the Court noted that the trucking companies there "produced *uncontradicted* evidence that the difference in passing time does not pose an appreciable threat to motorists traveling on limited access, four-lane divided highways." 434 U. S., at 444 (emphasis supplied). That is not the case here. Iowa indicated before the trial court the connection between greater passing time and greater hazard, primarily the longer exposure to splash and spray. For a vehicle traveling at 55 miles per hour passing a truck traveling at 52 miles per hour, the additional exposure from a 65-foot truck as opposed to a 60-foot truck would be 92 feet and more than a full second. App. 505. The greater passing distance and time would become even more significant off the Interstates when oncoming traffic is involved, and the District Court order permits the longer trucks to operate off the Interstates.

Patrol in the Iowa Department of Public Safety testified that longer vehicles pose greater problems at the scene of an accident. For example, trucks involved in accidents often must be unloaded at the scene, *id.*, at 400, which would take longer the bigger the load.

In rebuttal of Consolidated's evidence on the relative safety of 65-foot doubles to trucks permitted on Iowa's highways, Iowa introduced evidence that doubles are more likely than singles to jackknife or upset, *id.*, at 507. The District Court concluded that this was so and that singles are more stable than doubles. 475 F. Supp., at 549.[7] Iowa also introduced evidence from Consolidated's own records showing that Consolidated's overall accident rate for doubles exceeded that of semis for three of the last four years, App. 668–675, and that some of Consolidated's own drivers expressed a preference for the handling characteristics of singles over doubles. 475 F. Supp., at 549.

In addition Iowa elicited evidence undermining the probative value of Consolidated's evidence. For example, Iowa established that the more experienced drivers tended to drive doubles, because they have seniority and driving doubles is a higher paying job than driving singles. Since the leading cause of accidents was driver error, Consolidated's evidence of the relative safety record of doubles may have been based in large part not on the relative safety of the vehicles themselves but on the experience of the drivers. App. 27–28. Although the District Court, the Court of Appeals, and the plurality all fail to recognize the fact, Iowa also negated much of Consolidated's evidence by establishing that it considered the relative safety of doubles to singles, and not the question of length alone. Consolidated introduced much

---

[7] Although the District Court noted that doubles are more maneuverable, it certainly is reasonable for a legislature to conclude that stability is a more critical factor than maneuverability on the straight expanses of the Interstates.

evidence that its doubles were as safe as singles. See, *e. g.,* *id.,* at 23, 32–36, 45, 89, 153, 289, 304, 586, 609. Such evidence is beside the point. The trucks which Consolidated wants to run in Iowa are prohibited because of their length, not their configuration. Doubles are allowed in Iowa, up to a length of 60 feet, and Consolidated in fact operates 60-foot doubles in Iowa. Consolidated's experts were often forced to admit that they could draw no conclusions about the relative safety of 65-foot doubles and 60-foot doubles, as opposed to doubles and singles. See, *e. g., id.,* at 26, 53, 308. Conclusions that the double configuration is as safe as the single do not at all mean the 65-foot double is as safe as the 60-foot double, or that length is not relevant to vehicle safety. For example, one of Consolidated's experts testified that doubles "off track" better than singles, because of their axle placement, but conceded on cross-examination that a 60-foot double would off-track better than a 65-foot double. *Id.,* at 97, 107. In sum, there was sufficient evidence presented at trial to support the legislative determination that length is related to safety, and nothing in Consolidated's evidence undermines this conclusion.

The District Court approached the case as if the question were whether Consolidated's 65-foot trucks were as safe as others permitted on Iowa highways, and the Court of Appeals as if its task were to determine if the District Court's factual findings in this regard were "clearly erroneous." 612 F. 2d, at 1069. The question, however, is whether the Iowa Legislature has acted rationally in regulating vehicle lengths and whether the safety benefits from this regulation are more than slight or problematical. "The classification of the traffic for the purposes of regulation . . . is a legislative, not a judicial, function. Its merits are not to be weighed in the judicial balance and the classification rejected merely because the weight of the evidence in court appears to favor a different standard." *Clark* v. *Paul Gray, Inc.,* 306 U. S. 583, 594 (1939). "Since the adoption of one weight or width regula-

tion, rather than another, is a legislative and not a judicial choice, its constitutionality is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if the weight of evidence presented in court appears to favor a different standard." *Barnwell Brothers,* 303 U. S., at 191.[8]

The answering of the relevant question is not appreciably advanced by comparing trucks slightly over the length limit with those at the length limit. It is emphatically not our task to balance any incremental safety benefits from prohibiting 65-foot doubles as opposed to 60-foot doubles against the burden on interstate commerce. Lines drawn for safety purposes will rarely pass muster if the question is whether a slight increment can be permitted without sacrificing safety. As Justice Holmes put it:

"When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood

---

[8] The opinion of my Brother BRENNAN concurring in the judgment mischaracterizes this dissent when it states that I assume "resolution of the case must hinge upon the argument offered by Iowa's attorneys: that 65-foot doubles are more dangerous than shorter trucks." *Ante,* at 681. I assume nothing of the sort. As noted in the immediately preceding paragraph, the point of this dissent is that the District Court and the Court of Appeals erred when they undertook to determine if the prohibited trucks were as safe as the permitted ones on the basis of evidence presented at trial. As I read this Court's opinions, the State must simply prove, aided by a "strong presumption of validity," that the safety benefits of its law are not illusory. I review the evidence presented at trial simply to demonstrate that Iowa made such a showing in this case, not because the validity of Iowa's law depends on its proving by a preponderance of the evidence that the excluded trucks are unsafe. As I thought was made clear, it is my view that Iowa must simply show a relation between vehicle length limits and safety, and that the benefits from its length limit are not illusory. Iowa's arguments on passing time, intersection obstruction, and problems at the scene of accidents have validity beyond a comparison of the 65- and 60-foot trucks. In sum, I fully agree with JUSTICE BRENNAN that the validity of Iowa's length limit does not turn on whether 65-foot trucks are less safe than 60-foot trucks.

and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & Electric Co. v. Coleman,* 277 U. S. 32, 41 (1938) (dissenting opinion).

The question is rather whether it can be said.that the benefits flowing to Iowa from a rational truck-length limitation are "slight or problematical." See *Bibb,* 359 U. S., at 524. The particular line chosen by Iowa—60 feet—is relevant only to the question whether the limit is a rational one. Once a court determines that it is, it considers the overall safety benefits *from the regulation* against burdens on interstate commerce, and not any marginal benefits from the scheme the State established as opposed to that the plaintiffs desire. See *Southern Pacific,* 325 U. S., at 779 (train-length law struck down because it "affords at most slight and dubious advantage, if any, *over unregulated train lengths"*) (emphasis supplied); *Barnwell Brothers, supra,* at 190–192.

The difficulties with the contrary approach are patent. While it may be clear that there are substantial safety benefits from a 55-foot truck as compared to a 105-foot truck, these benefits may not be discernible in 5-foot jumps. Appellee's approach would permit what could not be accomplished in one lawsuit to be done in 10 separate suits, each challenging an additional five feet.

Any direct balancing of marginal safety benefits against burdens on commerce would make the burdens on commerce the sole significant factor, and make likely the odd result that

similar state laws enacted for identical safety reasons might violate the Commerce Clause in one part of the country but not another. For example, Mississippi and Georgia prohibit trucks over 55 feet. Since doubles are not operated in the Southeast, the demonstrable burden on commerce may not be sufficient to strike down these laws, while Consolidated maintains that it is in this case, even though the doubles here are given an additional five feet. On the other hand, if Consolidated were to win this case it could shift its 65-foot doubles to routes leading into Mississippi or Georgia (both States border States in which 65-foot trucks are permitted) and claim the same constitutional violation it claims in this case. Consolidated Freightways, and not this Court, would become the final arbiter of the Commerce Clause.

It must be emphasized that there is nothing in the laws of nature which make 65-foot doubles an obvious norm. Consolidated operates 65-foot doubles on many of its routes simply because that is the largest size permitted in many States through which Consolidated travels. App. 92, 240, 364–365. Doubles can and do come in smaller sizes; indeed, when Iowa adopted the present 60-foot limit in 1963, it was in accord with AASHTO recommendations. Striking down Iowa's law because Consolidated has made a voluntary business decision to employ 65-foot doubles, a decision based on the actions of other state legislatures, would essentially be compelling Iowa to yield to the policy choices of neighboring States. Under our constitutional scheme, however, there is only one legislative body which can pre-empt the rational policy determination of the Iowa Legislature and that is Congress. Forcing Iowa to yield to the policy choices of neighboring States perverts the primary purpose of the Commerce Clause, that of vesting power to regulate interstate commerce in Congress, where all the States are represented. In *Barnwell Brothers,* the Court upheld a South Carolina width limit of 90 inches even though "all other states permit a width of 96 inches, which is the standard width of trucks engaged in interstate

commerce." 303 U. S., at 184. Then Justice Stone, writing for the Court, stressed:

> "The fact that many states have adopted a different standard is not persuasive. . . . The legislature, being free to exercise its own judgment, is not bound by that of other legislatures. It would hardy be contended that if all the states had adopted a single standard none, in the light of its own experience and in the exercise of its judgment upon all the complex elements which enter into the problem, could change it." *Id.,* at 195–196.

See also *Sproles,* 286 U. S., at 390. Nor is Iowa's policy pre-empted by Consolidated's decision to invest in 65-foot trucks, particularly since this was done when Iowa's 60-foot limit was on the books. Cf. *id.,* at 390–391.[9]

The Court of Appeals felt compelled to reach the result it did in light of our decision in *Raymond* and the plurality agrees that "[t]his case is *Raymond* revisited," *ante,* at 671.[10] *Raymond,* however, does not control this case. The Court in *Raymond* emphasized that "[o]ur holding is a narrow one, for we do not decide whether laws of other States restricting the operation of trucks over 55 feet long, or of double-trailer trucks, would be upheld if the evidence produced on the safety

---

[9] The extent to which the assertion of a violation of the Commerce Clause is simply an effort to compel Iowa to yield to the decisions of its neighbors is clearest if one asks whether Iowa's law would violate the Commerce Clause if the 17 States which currently prohibit Consolidated's 65-foot doubles were not in the East and Southeast but rather surrounded Iowa.

[10] The opinion concurring in the judgment begins by stating that the regulation involved here is "nearly identical" to the one struck down in *Raymond, ante,* at 679, but then approaches the case in a completely different manner than the Court in *Raymond.* My Brother BRENNAN votes to strike down Iowa's law not because the safety benefits of Iowa's law are illusory—indeed, he specifically declines to consider the safety benefits—but because he views it as protectionist in nature. As I read the various opinions in this case, therefore, only four Justices invalidate Iowa's law on the basis of the analysis in *Raymond.*

issue were not so overwhelmingly one-sided as in this case." 434 U. S., at 447.[11]   The *Raymond* Court repeatedly stressed that the State "made no effort to contradict . . . evidence of comparative safety with evidence of its own," *id.*, at 437, that the trucking companies' evidence was "uncontroverted," *id.*, at 445, n. 19, and that the State "virtually defaulted in its defense of the regulations as a safety measure," *id.*, at 444.   By contrast, both the District Court and the Court of Appeals recognized that Iowa "made an all out effort" and "zealously presented arguments" on its safety case.   475 F. Supp., at 548; 612 F. 2d, at 1067–1068.   As noted, Iowa has adduced evidence sufficient to support its safety claim and has rebutted much of the evidence submitted by Consolidated.

Furthermore, the exception to the Wisconsin prohibition which the Court specifically noted in *Raymond* finds no parallel in this case.   The exception in *Raymond* permitted oversized vehicles to travel from plant to plant in Wisconsin or between a Wisconsin plant and the border.   434 U. S., at 446, and n. 24.   As the Court noted, this discriminated on its face between Wisconsin industries and the industries of other States.   The border-cities exception to the Iowa length limit does not.   Iowa shippers in cities with border-city ordinances may use longer vehicles in interstate commerce, but interstate shippers coming into such cities may do so as well. Cities without border-city ordinances may neither export nor import on oversized vehicles.   Nor can the border-cities exception be "[v]iewed realistically," as was the Wisconsin exception, to "be the product of compromise between forces within the State that seek to retain the State's general trucklength limit, and industries within the State that complain that the general limit is unduly burdensome."   *Raymond,* 434 U. S., at 447.   The Wisconsin exception was available to all Wisconsin industries wanting to ship out of State from Wis-

---

[11] JUSTICE BLACKMUN filed a concurring opinion, joined by three others, "to emphasize the narrow scope of [the] decision."   434 U. S., at 448.

consin plants. The border-cities exception is of much narrower applicability: only 5 of Iowa's 16 largest cities and only 8 cities in all permit oversized trucks under the border-cities exception. The population of the eight cities with border-city ordinances is only 13 percent of the population of the State.[12]

My Brother BRENNAN argues that the Court should consider only *the* purpose the Iowa legislators *actually* sought to achieve by the length limit, and not the purposes advanced by Iowa's lawyers in defense of the statute. This argument calls to mind what was said of the Roman Legions: that they may have lost battles, but they never lost a war, since they never let a war end until they had won it. The argument has been consistently rejected by the Court in other contexts, compare, *e. g.*, *United States Railroad Retirement Board* v. *Fritz*, 449 U. S. 166, 187–188 (1980), with *id.*, at 187–188 (BRENNAN, J., dissenting), and *Michael M.* v. *Superior Court of Sonoma County, ante,* at 469–470 (plurality opinion), with *ante,* at 494–496 (BRENNAN, J., dissenting), and JUSTICE BRENNAN can cite no authority for the proposition that possible legislative purposes suggested by a State's lawyers should not be considered in Commerce Clause cases. The problems with a view such as that advanced in the opinion concurring in the judgment are apparent. To name just a few, it assumes that individual legislators are motivated by one discernible "actual" purpose, and ignores the fact that different legislators may vote for a single piece of legislation for widely

---

[12] According to 1980 preliminary census data, the population of Iowa is 2,908,797. Cities with border-city ordinances, and their populations, are: Akron, 1,514; Bettendorf, 27,377; Clinton, 32,779; Council Bluffs, 56,269; Davenport, 103,036; Dubuque, 61,932; Hawarden, 2,719; and Sioux City, 81,434. Iowa's largest city and capital, Des Moines, with a population of 190,910, cannot avail itself of the border-cities exception, nor can Cedar Rapids, the second largest city, with a population of 110,124, or Waterloo, the fifth largest city, with a population of 75,535. Census Bureau, Population Division, Preliminary Count.

different reasons. See *Michael M., ante,* at 469–470; *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 265 (1977); *McGinnis* v. *Royster,* 410 U. S. 263, 276–277 (1973). How, for example, would a court adhering to the views expressed in the opinion concurring in the judgment approach a statute, the legislative history of which indicated that 10 votes were based on safety considerations, 10 votes were based on protectionism, and the statute passed by a vote of 40–20? What would the *actual* purpose of the *legislature* have been in that case? This Court has wisely "never insisted that a legislative body articulate its reasons for enacting a statute." *Fritz, supra,* at 461.[13]

---

[13] It is not a particularly pleasant task for the author of a dissent joined by two other Members of the Court to take issue with a statement made by the author of a concurrence in that same case which is joined by only one Member of the Court. Such fragmentation, particularly between two opinions neither of which command the adherence of a majority of the Court, cannot help but further unsettle what certainty there may be in the legal principles which govern our decision of Commerce Clause cases such as this and lay a foundation for similar uncertainty in other sorts of constitutional adjudication. Nonetheless, I feel obliged to take up the cudgels, however unwillingly, because JUSTICE BRENNAN's concurrence, joined by JUSTICE MARSHALL, is mistaken not only in its analysis but also in its efforts to interpret the meaning of today's decision.

Although both my Brother BRENNAN and I have cited cases from the equal protection area, it is not clear that the analysis of legislative purpose in that area is the same as in the present context. It may be more reasonable to suppose that proffered purposes of a statute, whether advanced by a legislature or *post hoc* by lawyers, cloak impermissible aims in Commerce Clause cases than in equal protection cases. Statutes generally favor one group at the expense of another, and the Equal Protection Clause was not designed to proscribe this in the way that the Commerce Clause was designed to prevent local barriers to interstate commerce. Thus even if my Brother BRENNAN's arguments were supportable in Commerce Clause cases, that analysis would not carry over of its own force into the realm of equal protection generally.

But even in the Commerce Clause area, his arguments are unpersuasive. *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522 (1959), see *ante,* at

Both the plurality and the concurrence attach great significance to the Governor's veto of a bill passed by the Iowa Legislature permitting 65-foot doubles. Whatever

682–683, n. 3, seems to me to cut against, rather than in favor of, his position. The Court in *Bowers* stated:

"What were the special reasons, motives or policies of the Ohio Legislature for adopting the questioned proviso we do not know with certainty, nor is it important that we should, *Southwestern Oil Co.* v. *Texas,* 217 U. S. 114, 126, for a state legislature need not explicitly declare its purpose. But it is obvious that it may reasonably have been the purpose and policy of the State Legislature, in adopting the proviso, to encourage the construction or leasing and operation of warehouses in Ohio by non-residents with the attendant benefits to the State's economy, or to stimulate the market for merchandise and agricultural products produced in Ohio by enabling nonresidents to purchase and hold them in the state for storage only, free from taxes, in anticipation of future needs. Other similar purposes reasonably may be conceived." 358 U. S., at 528–529.

The statute involved in *Bowers* was upheld on the basis of the various purposes which "reasonably may be conceived," without any effort to determine what the "actual" purpose was or any requirement that the purposes being considered somehow have been articulated by the lawmakers. *Wheeling Steel Corp.* v. *Glander,* 337 U. S. 562 (1949), simply did not consider the present question, since the State in *Glander* did not proffer any possible purposes beyond the one stated by the legislature in the statute.

Nor do the more recent decisions cited by my Brother BRENNAN support his argument. For example, the fact that we *"need not . . .* accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose *could not* have been a goal of the legislation," *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 648, n. 16 (1975) (emphasis supplied), hardly supports the proposition that we *cannot* consider assertions of legislative purpose which *could* have been a goal of the legislation, even though such purposes may not have been identified as goals by the legislature. To take another example, the upholding of the law in *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976), because it "rationally furthers the purpose identified by the State," certainly does not suggest that by "State" this Court meant only "legislature," and not the State's attorneys, or that *only* those purposes identified by the State could be considered in reviewing legislation.

Although JUSTICE BRENNAN "would emphasize" the significance the

views one may have about the significance of legislative motives, it must be emphasized that the law which the Court strikes down today was not passed to achieve the protectionist goals the plurality and the concurrence ascribe to the Governor. Iowa's 60-foot length limit was established in 1963, at a time when very few States permitted 65-foot doubles. See App. to Reply Brief for Appellants 1a, 2a. Striking down legislation on the basis of asserted legislative motives is dubious enough, but the plurality and concurrence strike down the legislation involved in this case because of asserted impermissible motives for *not* enacting *other* legislation, motives which could not possibly have been present when the legislation under challenge here was considered and passed. Such action is, so far as I am aware, unprecedented in this Court's history.

Furthermore, the effort in both the plurality and the concurrence to portray the legislation involved here as protectionist is in error. Whenever a State enacts more stringent safety measures than its neighbors, in an area which affects commerce, the safety law will have the incidental effect of deflecting interstate commerce to the neighboring States. Indeed, the safety and protectionist motives cannot be separated: The whole purpose of safety regulation of vehicles

---

plurality opinion attaches to the Governor's articulation of what is viewed as an impermissible purpose, this hardly supports the proposition that permissible purposes cannot be considered by a court unless they were somehow identified by the legislature as goals of the statute. The plurality opinion in fact examines the asserted safety purpose of the Iowa statute at some length. Indeed, JUSTICE BRENNAN criticizes the plurality for examining the safety purpose and "disregarding the intention of Iowa's lawmakers," *ante,* at 681.

Finally, JUSTICE BRENNAN's statement that we have strayed from what he regards as the true faith in our recent decision in *United States Railroad Retirement Board* v. *Fritz,* 449 U. S. 166 (1980), albeit over his vigorous dissent, does not aid his argument. His dissent, while undoubtedly vigorous, was not sufficiently persuasive to deter six Members of the Court from joining that opinion.

is to *protect* the State from unsafe vehicles. If a neighboring State chooses *not* to protect its citizens from the danger discerned by the enacting State, that is its business, but the enacting State should not be penalized when the vehicles it considers unsafe travel through the neighboring State.

The other States with truck-length limits that exclude Consolidated's 65-foot doubles would not at all be paranoid in assuming that they might be next on Consolidated's "hit list." [14] The true problem with today's decision is that it gives no guidance whatsoever to these States as to whether their laws are valid or how to defend them. For that matter, the decision gives no guidance to Consolidated or other trucking firms either. Perhaps, after all is said and done, the Court today neither says nor does very much at all. We know only that Iowa's law is invalid and that the jurisprudence of the "negative side" of the Commerce Clause remains hopelessly confused.

---

[14] Consolidated was a plaintiff in *Raymond* as well as this case.