**CLOVERLAND—GREEN SPRING DAIRIES, INC., Plaintiff**

**and**

**Thomas E. McGlinchey, et al., Plaintiffs/Intervenors**

**v.**

**PENNSYLVANIA MILK MARKETING BOARD, Beverly R. Minor, Individually and as Chairperson of the Board, Luke F. Brubaker and J. Robert Derry, Individually and as Members of the Board, Defendants**

**No. CIV 1:CV–99–0487.**

United States District Court, M.D. Pennsylvania.

April 12, 2001.

Scott Thomas Wyland, Kevin J. McKeon, Malatesta, Hawke & McKeon, Harrisburg, PA, Sheldon A. Weiss, Mountainside, NJ, for Cloverland–Green Spring Dairies, Inc.

Gwendolyn T. Mosley, Office of Atty. Gen., Harrisburg, PA, for Pennsylvania Milk Marketing Bd., Beverly R. Minor, Luke F. Brubaker, J. Robert Derry.

Allen C. Warshaw, Duane, Morris & Heckscher, Harrisburg, PA, for Pennsylvania Ass'n of Milk Dealers.

Thomas J. Finucane, Finucane Law Office LLP, Chambersburg, PA, for Thomas E. McGlinchey, Gertrude Giorgini, Sue A. Spigler.

## MEMORANDUM

RAMBO, District Judge.

Before the court are three separate motions for summary judgment submitted by Plaintiff, Intervenor Plaintiffs, and Defendants. The parties have briefed the issues, the court conducted oral argument on December 19, 2000, and on February 2, 2001, the court issued a memorandum and order addressing certain issues relevant to the cross-motions for summary judgment and allowing the parties to supplement the record and submit additional briefing. The parties have done so, and the motions are now ripe for disposition.

### I. *Background*

The instant action seeks a declaratory judgment that certain provisions of Pennsylvania's Milk Marketing Law, 31 Pa.Stat. Ann. §§ 700j–101, *et seq.* ("PMML"), and certain provisions of Official General Orders A–890A and A–900, (i) violate the Commerce Clause of the United States Constitution, and (ii) deprive Plaintiff of rights guaranteed pursuant to 42 U.S.C. § 1983. Additionally Plaintiff seeks to enjoin Defendants from enforcing the minimum milk prices fixed pursuant to Orders A–890A and A–900.

Unless otherwise indicated, the following facts are undisputed by the parties.[1] Plaintiff, Cloverland–Green Spring Dairies, Inc. ("Cloverland"), is a Maryland corporation that engages in the business of processing and selling milk to various wholesale accounts, primarily stores, within and around Baltimore, Maryland. Intervenor Plaintiffs are Pennsylvania milk consumers residing in Pennsylvania Milk Marketing Area # 4 ("Area # 4"), Sue A. Spigler and Gertrude Giorgini, and in Pennsylvania Milk Marketing Area # 1 ("Area # 1"), Thomas E. McGlinchey (collectively referred to as the "Milk Consumers," or together with Cloverland as "Plaintiffs"). Defendant Pennsylvania Milk Marketing Board (the "Board") is the Pennsylvania state administrative agency charged by state law with the task of promulgating orders designating milk marketing areas within the Commonwealth and fixing mini-

---

1. A detailed factual background is set forth in the court's memorandum of February 2, 2001 ("February Opinion"), and only relevant portions will be repeated herein.

mum wholesale and retail prices to be charged within such milk marketing areas. Defendant Beverly Minor is the present Chairperson of the Board, and Defendants Luke Brubaker and J. Robert Derry are the two other members of the Board. Acting in their official capacities, Defendants promulgated Official General Orders A–890A and A–900, including the minimum wholesale milk prices established thereby. Intervenor Defendant is the Pennsylvania Association of Milk Dealers ("PAMD").

Throughout most of the Northeast, including Southeastern and South Central Pennsylvania, the minimum prices that fluid milk processors ("handlers") must pay to dairy farmers ("producers") or associations of dairy farmers, are established by "regional" Federal Milk Marketing Orders, promulgated by the United States Secretary of Agriculture ("Secretary"), pursuant to the Agriculture Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 601, *et seq.*, as amended.

The Secretary has issued and enforced the "Middle Atlantic Marketing Order, Order # 4,"[2] which regulates the minimum prices that processing plants pay to producers for raw milk which is processed and packaged for sale to consumers. In determining said minimum producer prices, the Secretary is required by law to fix, among other things, such prices as he finds will "ensure a sufficient quantity of pure and wholesome milk to meet current needs and further assure a level of farm income adequate to maintain productive capacity sufficient to meet anticipated future needs, and be in the public interest." 7 U.S.C. § 608c(18). However, Federal Milk Marketing Orders do not in any way establish or fix "resale" prices, that is, wholesale prices paid to the handlers for the finished product or retail prices received by processors, distributors, or stores from the ultimate consumers.

The Commonwealth of Pennsylvania, through the Board, establishes and enforces "minimum" wholesale and retail milk prices which stores, schools, and consumers must pay for the milk they purchase. The state statute pursuant to which the Board sets said minimum prices is the PMML which was first enacted in 1933 during the Great Depression, several years before an effective federal milk marketing program was in place. The PMML mandates the Board to establish "milk marketing areas" within the Commonwealth, and to fix minimum "wholesale and retail" milk prices applicable to every level of transaction.

The operative provisions of the PMML with respect to the criteria to be employed by the Board in fixing minimum wholesale and retail prices are contained in PMML § 801. Among other things, that section requires that after a hearing, the Board shall "ascertain and maintain such prices ... for milk in the respective milk marketing areas as will ... best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to the inhabitants of the Commonwealth." 31 Pa.Stat. Ann. § 700j–801. Plaintiffs assert that Pennsylvania inhabitants would have a "sufficient quantity of pure and wholesome milk" without the fixing of minimum resale prices by the Board. (Harris ¶¶ 6–12, 23, 24, 26; Webster ¶ 4.)

Cloverland's efforts to solicit wholesale milk customers in Pennsylvania have been uniformly unsuccessful. Plaintiffs allege this is because: (1) no stores solicited by

---

**2.** On January 1, 2000, Order # 4 was consolidated with two other regional milk marketing orders in the Northeast, the New England Order # 1 and New York–New Jersey Order # 2, to become the new "Northeast" Federal Order. (Grattola Aff. Staff Ex. 2.)

Cloverland were purchasing milk at prices which were above the Board's minimums; (2) no wholesale customer was willing to purchase milk from Cloverland so long as it could obtain milk at the same price from its local suppliers; and (3) Cloverland is prohibited by PMML § 807 from selling, or offering to sell, milk for less than the minimum prices. (Webster ¶¶ 8, 9; Harris ¶ 25.) Defendants dispute that these are the reasons that Cloverland is unable to sell milk in Pennsylvania. However, David DeSantis, Chief of Enforcement and Accounting for the Board, admitted that most of the wholesale milk sold in Areas # 1 and # 4 is sold at the mandated minimum price. (Pl.'s Br. in Opp. to Mot. to Strike, Ex. A, DeSantis dep. ("DeSantis") at 60.)

## II. *Legal Standard*

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249, 106 S.Ct. 2505. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *White v. Westinghouse EEC. Co.,* 862 F.2d 56, 59 (3d Cir.1988).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Raymond Proffitt Found. v. U.S. Envt'l. Protection Agency,* 930 F.Supp. 1088, 1096 (E.D.Pa.1996).

## III. *Discussion*

The court held in its February Opinion that the appropriate standard of scrutiny to be applied in considering the dormant Commerce Clause violation alleged in the action *sub judice* is *Pike* balancing.[3] (February Opinion at 24–28.) Based on this balancing test, the PMML "will be upheld unless 'the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.'" *Harvey & Harvey, Inc. v. County of Ches-*

---

**3.** In arriving at this conclusion, the February Opinion included an extensive discussion of dormant Commerce Clause jurisprudence. (February Opinion at 17–28.) The February Opinion is incorporated herein by reference.

*ter*, 68 F.3d 788, 797 (3d Cir.1995) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). The court further held that the wholesale prices established by the PMML do produce incidental burdens on interstate commerce, specifically, that "less out-of-state milk passes across the Pennsylvania border to be sold in Pennsylvania than would in the absence of the PMML." (February Opinion at 29.) The court's opinion also allowed the PAMD to intervene as a defendant, and as a result allowed all parties to supplement the record with factual evidence to be utilized in conducting the *Pike* balancing. (*Id.* at 33, 36.)

The parties supplemented the record and provided additional briefing on the cross-motions for summary judgment. Therefore, the issue before the court is whether the burdens produced on interstate commerce by the PMML clearly outweigh the putative local benefits. In the court's February Opinion, it cited recent dicta from the Sixth Circuit for the proposition that, if the state statute in question fails to provide local benefits which do not already exist, then even an incidental burden on interstate commerce will be clearly excessive. (February Opinion at 31) (citing *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 444 (6th Cir.2000).) This court stated that it did not have evidence of record establishing that the PMML provided any local benefit. However, the supplemental submissions by Defendant PAMD provide evidence that the PMML does provide local benefits. Furthermore, the PAMD raises the issue that the *Pike* balancing test requires balancing the burdens on commerce against the "putative" local benefits. *Pike*, 397 U.S. at 142, 90 S.Ct. 844.

### A. *Putative Local Benefits*

█ The PAMD asserts that the term "putative" within the *Pike* balancing test

should take the plain dictionary definition of "supposed" which is defined as, "presumed to be true or real without conclusive evidence." (Supp. Mem. of Law of PAMD "PAMD Supp." at 9) (quoting The American Heritage Dictionary of the English Language: Fourth Edition). The PAMD therefore asserts that the court should go no further than the purpose of the PMML as stated by the Pennsylvania legislature. In support, the PAMD cites *Tolchin v. Supreme Court of the State of New Jersey*, which in upholding a statute against a dormant commerce clause challenge, refused to "second guess the empirical judgment of lawmakers concerning the utility of legislation." 111 F.3d 1099, 1111 (3d Cir.1997) (quoting *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987)).

The court here finds that in using the phrase "putative local benefits" in the *Pike* balancing test, the Justices of the Supreme Court carefully chose the words to express the opinion of the Court and therefore the word "putative" must add some meaning to the phrase. *Cf. Williams v. Taylor*, 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)) (recognizing, in context of interpreting acts of Congress, "the cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute"). However, the court does not find that the meaning of "putative" asserted by the PAMD is applicable. While deference is due to the state legislature's intended benefits, it is not to the high degree urged by the PAMD.

The language cited by the PAMD in *Tolchin* and *CTS Corp.* originates in Justice Brennan's concurring opinion in *Kassel v. Consolidated Freightways Corp.*, 450

U.S. 662, 679, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring in judgment). *Kassel* was a dormant Commerce Clause case that struck down an Iowa statute prohibiting trucks over 60 feet long from using Iowa roadways. The purpose of the statute, as identified by the lawmakers, was to discourage interstate truck traffic on Iowa's highways, but during litigation Iowa's lawyers asserted that longer trucks are more dangerous than shorter trucks. *Id.* at 681. Three opinions were filed, none of which carried a majority of the Court. Brennan's concurrence struck down the statute because of the Iowa lawmakers' unconstitutional purpose of protecting its roads at the expense of out-of-state roads. He described the *Pike* balancing as "the judicial task [of] balanc[ing] the burden imposed on commerce against the local benefits sought to be achieved by the State's lawmakers." *Id.* at 680 (citing *Pike*, 397 U.S. at 142, 90 S.Ct. 844). He explained that:

> In determining those benefits, a court should focus ultimately on the regulatory purposes *identified by the lawmakers* and on the evidence before or available to them that might have supported their judgment. Since the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation, the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes. It is not the function of the court to decide whether *in fact* the regulation promotes its intended purpose, so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes.

*Id.* at 680–81, 101 S.Ct. 1309 (citations omitted) (emphasis in original). Therefore, even Justice Brennan's opinion admits that the court must look beyond the "supposed" benefits to establish whether the lawmakers could have believed in the purported purpose of the statute.[4]

Both the plurality opinion and the dissenting opinion in *Kassel* spent considerable time discussing the evidence presented at trial concerning the relative safety of the 65–foot doubles and shorter trucks. The plurality opinion struck down the statute because the trial court found that shorter trucks were as safe as 65–foot doubles, 450 U.S. at 672, 101 S.Ct. 1309, and the burden on interstate commerce was substantial, thus outweighing the minimal or nonexistent local benefits. *Id.* at 678–79, 101 S.Ct. 1309. The dissenting opinion considered that in such a highway safety context, the state's burden is proving "that the safety benefits are not illusory." 450 U.S. at 697 n. 8, 101 S.Ct. 1309 (J. Rehnquist, dissenting). The dissent held that Iowa did "show a relation between vehicle length limits and safety, and that the benefits from its length limit are not illusory." *Id.* Therefore, all of the opinions in *Kassel* require, even in a safety context, that courts examine beyond the supposed or putative benefits of a state statute if those putative benefits are challenged.

It is unclear how the Supreme Court would view a court's role in evaluating the putative benefits of a state statute that does not regulate in the field of safety. In other fields, where less deference is owed to the state legislature, one would expect that a court be required to examine the purported local benefits at least, if not more, scrupulously. In the case *sub judi-*

---

4. Even in the area of safety, where state lawmakers deserve the highest deference, courts still must "establish[ ] that the intended safety benefit is not illusory, insubstantial, or nonexistent." *Id.* at 681 n. 1.

*ce,* one of the PMML's purported purposes is to "insure a sufficient quantity of pure and wholesome milk to the inhabitants of the Commonwealth." 31 Pa.Stat. Ann. § 700j–801. While Defendants assert this purpose is meant to relate to the health of the inhabitants of Pennsylvania, it is not in the same category of deference to state legislatures as highway safety. Therefore, the court will give some level of deference to the Pennsylvania legislature and a moderate presumption of validity to the putative local benefits, but will also consider whether Plaintiffs have proved that the purported benefits are illusory or a pretext for discrimination. *See Dean Milk Co. v. City of Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (holding that an ordinance cannot be found valid simply because it professes to be a health measure, otherwise it would "mean that the Commerce Clause of itself imposes no limitations on state action other than those laid down by the Due Process Clause, save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods"); *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (striking down, as violating the Commerce Clause, a New York milk pricing statute with discriminatory intent, though the purported purpose was of maintaining an adequate supply of milk to make its inhabitants healthy); *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (When considering the purpose of a statute challenged on dormant Commerce Clause grounds, a court is not bound by "'[t]he name, description or characterization given it by the legislature or the courts of the State,' but will determine for itself the practical impact of the law.") (quoting *Lacoste v. Louisiana Dept. of*

*Conservation,* 263 U.S. 545, 550, 44 S.Ct. 186, 68 L.Ed. 437 (1924)). Thus, the court interprets the putative local benefits to be those benefits sought to be achieved by the state's lawmakers which are presumed valid but may be rebutted.

**B.** *Pike Balancing Test*

■ Turning to the evidence adduced in the case *sub judice,* Defendants have supplemented the record with evidence that the PMML does help to produce the local benefit purported in the statute-to insure a sufficient quantity of milk. Joel Rotz, the Dairy Specialist for the Pennsylvania Farm Bureau, submits an affidavit stating:

> Since 1988, it has been shown that the level of prices mandated by the Federal Government in its Federal Marketing Orders to be paid to dairy farmers in Pennsylvania have been inadequate to provide average Pennsylvania dairy farmers with satisfactory returns on their costs of production. Pursuant to evidence and testimony offered at Milk Marketing Board hearings, the Board has issued orders establishing a mandated premium for Class I milk produced, processed and sold in Pennsylvania. This premium requires dealers to pay and Pennsylvania dairy farmers to receive a price for Class I milk which is above mandated Federal Order prices and which better ensures that dairy farmers will be able to adequately cover their costs of production.

(Joel B. Rotz. Aff. ¶ 3.) Carl Herbein, a certified public accountant, testifies that these "over-order" premiums are necessary because the Federal Milk Marketing Orders have not been adequate to cover Pennsylvania farmers' costs.[5] (Carl Her-

**5.** Herbein testifies that he reviewed the transcript of a November 8, 2000 hearing before the Board concerning the "over-order" premiums, as well as exhibits admitted into evidence at the hearing. (*Id.* ¶ 7; Grottola Aff. Ex. 1, Nov. 8, 2000 Hearing.) Plaintiff argues

bein Aff. ¶¶ 8–9.) Herbein further testifies that the PMML's minimum wholesale prices are "necessary to ensure that an adequate supply of fluid milk will be available for consumption by Pennsylvania consumers because, absent such prices, there is a substantial likelihood that there would be a return to the predatory conditions which caused the Pennsylvania Legislature to enact (and later reenact) the Pennsylvania Milk Marketing Law." (*Id.* ¶ 14.) While this evidence does not prove by a preponderance of the evidence that the PMML's minimum prices act to produce significant local benefits today, it is sufficient to establish that the putative local benefits are not illusory or a pretext for discriminatory intent. In an effort to challenge the Pennsylvania legislature's purported purpose of the PMML, Plaintiffs proffer that Pennsylvania produces more milk than its inhabitants drink and neighboring states have been able to maintain adequate supplies of milk without state-mandated minimum prices. However, this is not sufficient evidence that the putative local benefits are non-existent or that the legislature could not have believed in the purported purpose of the statute. Without such evidence, the court cannot discount the benefits. *Cf. Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 447–48, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (regulation overturned where evidence was "overwhelmingly one-sided" that it did not contribute to state's putative interest). Therefore, the court finds that the PMML does possess some level of legitimate putative local benefit.

■ In addition to evidence concerning the benefit of the PMML, Defendants have submitted supplemental evidence relating to the burden on interstate commerce. In the February Opinion, the court found that there was an incidental burden on interstate commerce—that "less out-of-state milk passes across the Pennsylvania border to be sold in Pennsylvania than would in the absence of the PMML." (February Opinion at 29.) Although the PMML's minimum wholesale prices applied to both in-state and out-of-state processors, the court found that the burden on interstate commerce was caused by Pennsylvania retailers lacking an incentive to change from their status quo in-state processors to out-of-state processors if the out-of-state processors were not permitted to utilize any higher efficiency by lowering their prices. (*Id.*)

Defendants have submitted evidence in three general classes which prove that this incidental burden on interstate commerce is much less substantial than the court had previously believed. First, Defendants produce affidavits from four Pennsylvania milk processors who testify that they compete on such criteria as brand recognition, quality of service, quality of milk, packaging, and variety of products. (Todd Rutter Aff. ¶ 4; James Kinley Aff. ¶ 4; James Marburger Aff. ¶ 3; William Jones Aff. ¶ 4.) More importantly, the affidavits indicate that those processors are constantly

---

that Herbein's opinion testimony should be precluded because: (1) "no unbiased dairy economist, or any other person for that matter, could have read that record and come to that 'opinion' "; (2) Herbein is an accountant to the milk industry, not an agricultural economist, and his opinions range far outside his professed area of expertise; (3) his affidavit does not qualify under Federal Rule of Evidence 702 for expert opinion; and (4) his affidavit does not qualify under Federal Rule of Evidence 701 for lay opinion testimony. (Pl.'s Supp. Br. at 10, n. 14.) The court is not persuaded by these arguments to discount Herbein's testimony, because as described *infra,* Plaintiffs have not demonstrated the PMML's purported purposes to be pretext, and therefore the court need not find by a preponderance of the evidence that the putative local benefits actually inure.

gaining and losing customers based on those criteria. (Rutter Aff. ¶ 5, Ex. A; Kinley Aff. ¶ 5, Ex. A; Marburger Aff. ¶ 4, Ex. A; Jones Aff. ¶ 5.) The second type of evidence is a collection of 22 affidavits from retailers who sell milk within Areas # 1 and # 4 in Pennsylvania. The retailers indicate that they choose their milk suppliers based on criteria other than price. One retailer indicated that he switched suppliers because of brand recognition, and another indicated that he was approached by a new supplier to switch, but did not based on brand recognition. (Kwant Na Aff. ¶ 6; Barry Kline Aff. ¶ 6.) This evidence demonstrates that the transaction costs associated with switching milk dealers is not so prohibitive that out-of-state dealers are effectively excluded by the PMML's minimum prices.

The final category of evidence that Defendants submit concerns an aspect of milk pricing in Pennsylvania not previously discussed by the court. The PMML permits dealers to provide milk processing services to other licensed dealers at cost, pursuant to a service contract or "tolling agreement." Tolling agreements are regulated by Official General Order A–875, and make no distinction between instate and out-of-state dealers. (David Desantis Aff. Ex. B, "OGO A–875".) Tolling agreements allow retailers to obtain milk products at prices below the PMML's wholesale minimum prices from dealers who can process milk at costs lower than the average cross-section used by the Board in establishing the minimum prices. (Desantis Aff. ¶¶ 4–5.) In March 1999, nearly one-third of milk sold in Pennsylvania was marketed under the terms of a tolling agreement. Out-of-state tolling milk dealers made up 7% of all Class I milk sales in Pennsylvania. (Id. ¶ 7.) Plaintiff Cloverland does not participate in any tolling agreement.

From these sources of evidence it appears that the incidental burden on interstate commerce is minimal. Milk retailers do switch from their milk dealers, although not necessarily based on price. Furthermore, the tolling agreements allow out-of-state dealers, as well as in-state dealers, to sell milk at prices that reflect their own processing costs and below the PMML's wholesale minimum prices. Moreover, while it is likely that more out-of-state milk would be sold within Pennsylvania without the PMML's minimum prices, Plaintiffs offer no conclusive evidence that the difference is substantial. The final step is to apply the *Pike* balancing test to determine if this burden on interstate commerce is clearly excessive in relation to the putative local benefits. 397 U.S. at 142, 90 S.Ct. 844.

■ Plaintiff cites *Pike*'s direction to consider if any less burdensome alternatives would produce the local benefits. *Id.* Plaintiff suggests that the Board could utilize the lower variable costs rather than the higher total costs in setting the minimum wholesale prices. It claims that this is evidence that the burden on interstate commerce is excessive in relation to the local benefit. However, the court fails to see how using the lower costs and setting a lower minimum wholesale price would be less burdensome on interstate commerce. Even assuming that the PMML required the Board to set the price of milk at an extraordinarily high price, the minimal burden on interstate commerce would remain the same. The level of the minimum price would not affect the burden because the burden arises from the disincentive to switch milk dealers if the switch entails any transaction costs which cannot be recouped because the new dealers' price cannot be lower than the statutory minimums. Therefore, the consequence that out-of-state dealers cannot sell much of their milk

into Pennsylvania because the retailers have little incentive to change from their current in-state suppliers would remain the same. Therefore, the court does not find that using the lower variable costs would be a less burdensome alternative to the PMML's current method of establishing minimum prices.

██ Applying the *Pike* balancing test, the court finds that no reasonable jury could find the minimal incidental burdens on interstate commerce to be clearly excessive in relation to the putative local benefits. While the evidence of record, and even the *Pike* balancing test itself, does not lend itself to a numerical or quantitative comparison of the burdens and benefits of the PMML's minimum prices, the court is convinced that the benefits are not *clearly* outweighed by the burdens.[6] Accordingly, the court finds that the PMML's wholesale and retail minimum prices do not violate the Commerce Clause.

### IV. *Conclusion*

In accordance with the foregoing discussion, the court finds that Defendants' motion for summary judgment should be granted and Plaintiff and Intervenor Plaintiffs' motions for summary judgment should be denied. An appropriate order will issue.

---

**6.** The court need not discuss further the allegation that the minimum retail prices violate the Commerce Clause because no supplemental evidence was submitted which disputes the February Opinion finding that the retail prices do not discriminate against out-of-state interests and do not produce any incidental burdens on interstate commerce. (February Opinion at 34.)